IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA,
*Appellee,*

*v.*

KENNETH WAYNE THOMPSON, II,
*Appellant.*

No. CR-19-0141-AP
**Filed January 19, 2022**

Appeal from the Superior Court in Yavapai County
The Honorable Patricia A. Trebesch, Judge (Retired)
No. P1300CR201200355

**AFFIRMED**

COUNSEL:

Mark Brnovich, Arizona Attorney General, Brunn (Beau) Roysden III, Solicitor General, Jeffrey L. Sparks, Capital Litigation Section Chief, David E. Ahl (argued), Assistant Attorney General, Phoenix, Attorneys for State of Arizona

Stephen L. Duncan (argued), Law Offices of Stephen L. Duncan, P.L.C., Scottsdale, Attorney for Kenneth Wayne Thompson, II

VICE CHIEF JUSTICE TIMMER authored the opinion of the Court, in which JUSTICES BOLICK, LOPEZ, BEENE, MONTGOMERY, KING, and PELANDER (Ret.) joined.[*]

VICE CHIEF JUSTICE TIMMER, opinion of the Court:

¶1          Kenneth Wayne Thompson was sentenced to death after a jury found him guilty of multiple counts of first degree murder for the 2012 murders of Penelope Edwards and Troy Dunn in Prescott Valley. We have jurisdiction over this automatic appeal under article 6, section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031 and -4033(A).[1] We affirm Thompson's convictions and sentences.[2]

## BACKGROUND[3]

¶2          The double murder here is rooted in a twisted family tale. Edwards was Thompson's sister-in-law and Dunn was Edwards' fiancé. Thompson was married to Edwards' sister, Gloria, and they lived in Missouri. Gloria previously had custody of Edwards' two children ("Daughter" and "Son") from 2004 to 2008 after Edwards failed to report Son's father for molesting Daughter.

---

[*]       Chief Justice Brutinel is recused from this case. Pursuant to article 6, section 3 of the Arizona Constitution, Justice John Pelander (Ret.), of the Arizona Supreme Court was designated to sit in this matter.

[1]       We cite the current versions of statutes unless they have materially changed since Thompson committed the offenses.

[2]       Thompson died shortly before issuance of this opinion. Because whether the trial court properly imposed the death penalty, the harshest sentence permitted in Arizona, is a matter of statewide concern, and because resolution of many issues in this case would assist parties and courts in future cases, we nevertheless decide this appeal. *See State v. Reed*, 248 Ariz. 72, 80–81 ¶¶ 29–31 (2020).

[3]       We view the facts in the light most favorable to sustaining the jury's verdicts. *State v. Gallegos*, 178 Ariz. 1, 9 (1994).

¶3            Gloria stayed in contact with Daughter through text messages and emails after the children were returned to Edwards' care in 2008.   On March 11, 2012, Gloria became upset and angry after learning Daughter planned a trip that placed her at risk of engaging in sexual contact with an adult, and that Son had been committed to the psychiatric department at a children's hospital after a physical altercation with Edwards.   She spoke to Thompson about her frustration and considered hiring a lawyer to explore the possibility of having the children placed with her again in Missouri.

¶4            Two days later, Thompson deposited an insurance check into his bank account, reserving $10,000 in cash.   Later that day, he activated a prepaid "TracFone," although he already owned a cell phone subscribed to a Verizon plan.   He did not provide the TracFone servicer with his personal information when requested.   Thompson used the TracFone to arrange to purchase a handgun from an individual, whom he met at a gas station later that day to complete the transaction.

¶5            The next evening, Thompson left his home in Missouri, telling Gloria he would be in Tennessee for a few days to conduct personal business.   Instead, he headed for Prescott Valley in his car.   He took the TracFone and made various calls with it, but he did not take his personal cell phone, and he did not communicate with Gloria during his drive.

¶6            Thompson purchased a GPS unit in New Mexico and used it to navigate to Arizona, arriving in Prescott Valley late on March 15, where he checked into a motel.   Early the next morning, he took a taxi to a Walmart.   While the driver waited, Thompson purchased a change of clothes, a camping axe, and a knife with a sheath that could be threaded onto a belt.

¶7            After making other stops, the taxi took Thompson to the victims' home around 7:00 a.m.   While en route, Thompson told the driver he intended to visit "his sister" and that he didn't get along with "her husband" very well.   After expressing surprise that the husband's car was parked outside the home, Thompson asked the driver to wait in case it was a short visit.   About five minutes later, Thompson returned and told the driver everything was fine, and he could leave.

¶8            At 9:40 a.m., the same taxi driver picked Thompson up at the victims' residence and dropped him off at his motel.   Thompson checked out and drove to two stores, where he bought drain acid, a watering can,

3

bath towels, and a new shirt.   During this time, Thompson used Dunn's cell phone to make calls.

¶9        Thompson returned to the victims' home around 10:30 a.m. and left again ten minutes later.   After making several stops to purchase gas cans, diesel fuel, and flares, Thompson used these items to set fire to the victims' home.

¶10        After the fire was extinguished, investigators found the victims' bodies.   Dunn, who was found inside the home, had been dead for several hours and had significant head trauma, including skull fractures caused by "chop" type wounds.   A trail of blood led from inside the house to the side of the home, where Edwards' body was found partially covered by a blanket.   She had injuries on her head, arms, and torso, likely caused by "an axe or smaller axe, something like a hatchet," according to the medical examiner.   Both bodies had chemical burns caused by an acid-based drain cleaner.   Edwards had defensive wounds, but Dunn did not. Investigators found a hatchet lying on Edwards' torso and a knife near Dunn's body.   The knife was the same type as the one purchased by Thompson before he went to the victims' home.

¶11        Around 4:00 p.m., state trooper Matthew Bratz stopped Thompson's car traveling east on Interstate 40 near Flagstaff after Thompson failed to slow down or change lanes for a stopped emergency vehicle in violation of Arizona law.   During the stop, Bratz noticed Thompson seemed "very nervous" as "[h]e had a very rapid and heavy rise and fall of his chest" and "his hand shook pretty grossly as he provided his driver's license, registration, [and] insurance."   Thompson was also "argumentative about exiting the vehicle and rolling the window down." Bratz ultimately issued Thompson a warning and told Thompson the traffic stop was over.

¶12        As Thompson turned back toward his car, Bratz asked if he could ask additional questions, and Thompson consented.   Thompson refused Bratz's request to search the car, but he agreed to permit Bratz to run his drug-detector dog around the car's outside.   The dog alerted near the trunk.

¶13        Before Bratz searched the car, Thompson asked repeatedly to retrieve a water bottle from his backpack.   Bratz retrieved the backpack and opened it.   He did not find a water bottle but instead found a gun and a hatchet covered in bright red blood and what appeared to be a long

human hair stuck to the blade. A complete search of the car later yielded blood-stained clothing; road flares; two gas cans; a watering can with acid residue dripping from the spout; two cell phones (the TracFone and Dunn's cell phone); a belt with an empty knife sheath threaded onto it; and various bags, packaging, and receipts for the items purchased at stores in Prescott Valley. Thompson's wallet contained over $3400, mostly in $100 bills. The hatchet found in Thompson's backpack was later determined to be the same type as the one he purchased at Walmart on the morning of the murders. Bratz contacted dispatch to determine if there had been a homicide in the area and was informed of the murders and house fire in Prescott Valley.

¶14 After Thompson was arrested, Prescott Valley Police detectives Matt Hepperle and Ed Bills interviewed him. Thompson explained he had traveled to Prescott Valley to convince Edwards to let him take Son back to Missouri with him for the summer as an anniversary surprise for Gloria. Upon arriving at the victims' home, he heard screaming coming from inside and ran in to discover Dunn attacking Edwards with a hatchet. After Dunn dropped the hatchet and started attacking Edwards with a knife, Thompson picked up the hatchet and killed Dunn with it. According to Thompson, Edwards ran out the back door, he followed and saw her collapse and die.

¶15 The detectives pointed out holes in Thompson's story, including the implausibility of Edwards being able to run outside after being injured, but Thompson did not admit to killing Edwards. He acknowledged he had placed the knife and hatchet on the victims to "save you guys a step." Thompson said he panicked after the killings and sought to erase evidence of his DNA at the scene because he was a felon and did not think the police would believe his story. He admitted pouring drain cleaner on the bodies and, when the acid failed to adequately destroy the evidence, using diesel fuel and flares to set fire to the house.

¶16 The State indicted Thompson on twelve counts, including premeditated first degree murder (counts 1–2) and felony murder predicated on burglary (counts 3–4). The State later gave notice of its intent to seek the death penalty, listing seven aggravators pursuant to

A.R.S. § 13-751(F). [4] After a *Chronis* [5] hearing, the trial court found probable cause for all aggravators.

¶17 After a ten-day trial, the jury found Thompson guilty of the first degree murders of Dunn and Edwards under both premeditated and felony murder theories (counts 1–4). The jury also found Thompson guilty of burglary in the first degree and arson of an occupied structure (counts 7–8), both of which the jury found to be dangerous offenses. And the jury found Thompson guilty of criminal damage ($10,000 or more) and tampering with physical evidence (counts 9 and 12). The trial court entered a judgment of acquittal on felony murder counts based on arson (counts 5–6) and granted the State's motion to dismiss weapons misconduct charges (counts 10–11).

¶18 At the end of the aggravation phase, the jury found five aggravating circumstances with regard to Edwards: (1) Thompson was previously convicted of a serious offense, whether preparatory or completed (F)(2); (2) Thompson committed the offense in an especially cruel, heinous, or depraved manner (F)(6); (3) Thompson committed first degree murder, burglary, arson, criminal damage, and tampering with physical evidence while on probation for a felony offense (F)(7); (4) Thompson was convicted of one or more other homicides, and those homicides were committed during the commission of the offense (F)(8); and (5) the offense was committed in a cold, calculated manner without pretense of moral or legal justification (F)(13). *See* A.R.S. §§ 13-751(F)(2), -751(F)(6), -751(F)(7), -751(F)(8), -751(F)(13) (2018).

¶19 Regarding Dunn, the jury found the aggravators (1) and (3)–(5) above. It also found the especially heinous or depraved designation under (F)(6). It was not asked to find the especially cruel aggravator under (F)(6).

---

[4] After this case was tried in 2019, the legislature amended § 13-751 and eliminated multiple aggravators, including, as relevant here, the cold-and-calculated aggravator in subsection (F)(13). It also renumbered the remaining subsections in subsection (F). *See* 2019 Ariz. Sess. Laws ch. 63, § 1 (1st Reg. Sess.). We cite the version of § 13-751 in effect at the time of sentencing here.

[5] *Chronis v. Steinle*, 220 Ariz. 559 (2009).

¶20        After the penalty phase of the trial, the jury returned death verdicts for both murders.   For the non-capital counts, the trial court imposed concurrent prison sentences.   This automatic appeal followed.

## DISCUSSION

### I.  Pretrial issues

### A.  Merger

¶21        Thompson argues the trial court erred by denying his motion to dismiss counts 3 and 4 (felony murder based on burglary) and permitting imposition of the death penalty for his convictions on these counts.   He reasons that because the burglary was predicated on his intent to enter the victims' home to murder one or both of them, the burglary charges merged into the first degree murder charges.   We review the court's ruling de novo as a mixed question of fact and law.   *See State v. Moore*, 222 Ariz. 1, 7 ¶ 17 (2009).

¶22        We have rejected arguments like Thompson's in other cases. *See id.* at 13–14 ¶¶ 57–63 (concluding that proof of entering with intent to commit murder suffices to establish felony murder through burglary and noting it would "be anomalous to conclude that first-degree murder occurs if a burglary with intent to assault results in death but not if the burglary is based on the more culpable intent to murder"); *State v. Kuhs*, 223 Ariz. 376, 382 ¶ 23 n.4 (2010) (rejecting argument that "one cannot commit felony murder when one committed burglary in order to commit murder"); *State v. Hardy*, 230 Ariz. 281, 287 ¶ 26 (2012) ("Because Arizona's felony murder statute applies when the predicate offense of burglary is undertaken with the intent to murder the victim, it follows that the statute likewise applies if the predicate offense is kidnapping based on intent to aid in committing a murder.").

¶23        Thompson does not offer any compelling reasons to overturn these cases.   For the most part, he refuses to acknowledge our holdings that premeditated murder and burglary with the intent to murder are separate offenses.   *See State v. Styers*, 177 Ariz. 104, 112 (1993) ("Although the jury findings in this case clearly demonstrate that the kidnapping was pursuant to a plan to kill, that does not mean that only one crime was committed.    Thus, the merger doctrine would not apply here."). Thompson seeks to distinguish *Kuhs* and *Hardy* because the defendants in those cases forced their way into their victims' homes while he did not.

But this distinction is meaningless because burglary does not require forced entry. *See* A.R.S. § 13-1507(A) (stating burglary can be committed "by entering or remaining unlawfully in or on a residential structure with the intent to commit any theft or any felony therein").

¶24     Finally, as the State points out, any error here is harmless because the jury imposed the death penalty for counts 1 and 2, premeditated murder. *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 18 (2005) (describing the harmless error standard).

### B.   Motion to suppress

¶25     Thompson argues the trial court erred by denying his motion to suppress the evidence recovered during the traffic stop and any "fruit" of that search pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and article 2, sections 4 and 8 of the Arizona Constitution.   He asserts (1) the stop was unjustified; and (2) the dog sniff did not create sufficient probable cause to search Thompson's car.

¶26     We review the court's ruling for an "abuse of discretion, considering only the evidence presented at the suppression hearing and viewing it in the light most favorable to sustaining the trial court's ruling." *State v. Primous*, 242 Ariz. 221, 223 ¶ 10 (2017).   An error of law in reaching a discretionary conclusion may constitute an abuse of discretion.   *State v. Johnson*, 247 Ariz. 166, 186 ¶ 45 (2019) (quoting *State v. Wall*, 212 Ariz. 1, 3 ¶ 12 (2006)).   "Whether the probable cause determination here comports with the Fourth Amendment is a mixed question of law and fact that we review de novo."   *State v. Cheatham*, 240 Ariz. 1, 2 ¶ 6 (2016).

### 1.   Reasonable suspicion to stop the car

¶27     Thompson generally recites the law concerning the propriety of a traffic stop, but he never develops an argument that the trial court erred by finding the stop here proper.   He has therefore waived that argument. *See Johnson*, 247 Ariz. at 194 ¶ 91.

¶28     At any rate, the court did not abuse its discretion because evidence supports a conclusion that Bratz properly stopped Thompson's car.   The Fourth Amendment and article 2, section 8 of the Arizona Constitution protect people from unreasonable searches and seizures. Law enforcement officers "seize" individuals by temporarily detaining

them during traffic stops. *See Whren v. United States*, 517 U.S. 806, 809–10 (1996); *State v. Evans*, 237 Ariz. 231, 233 ¶ 1 (2015). To pass constitutional muster, the stop must be supported by reasonable suspicion that criminal activity is occurring, even when probable cause is lacking. *See Evans*, 237 Ariz. at 234 ¶ 7. An officer's subjective motivation for the stop does not invalidate an otherwise lawful traffic stop. *See Whren*, 517 U.S. at 812–13.

¶29 The record supports the trial court's ruling that the stop was justified. Bratz was parked with his drug-detector dog, Leo, in a marked highway patrol car and monitoring traffic on Interstate 40 when Thompson drove by him. Bratz's attention was drawn by Thompson's rigid, erect posture, and straight-ahead stare, which Bratz characterized as uncommon, nervous behavior. After Thompson had traveled another half-mile, Bratz followed. Soon, Bratz observed Thompson's car traveling in the right-hand lane between another car and a semi-truck. As the trio approached another patrol car displaying flashing lights and a pulled-over semi-truck in the right-hand emergency lane, all but Thompson pulled into the left-hand lane to safely distance themselves from the stationary vehicles. Thompson neither switched to the left lane, although there was room to do so, nor slowed down.

¶30 Arizona law requires drivers approaching a stationary vehicle displaying flashing lights on the side of the highway to either move to a lane not adjacent to the vehicle or, if doing so would be unsafe, to slow down while passing the vehicle. *See* A.R.S. § 28-775(E). Bratz saw Thompson violate this law, giving Bratz reasonable suspicion to stop Thompson. The trial court did not err by ruling that the stop was reasonable and therefore justified under the state and federal constitutions. *See Whren*, 517 U.S. at 812–13; *Evans*, 237 Ariz. at 234 ¶ 7.

## 2. Probable cause to search the car

¶31 Thompson argues the search was conducted without probable cause. Warrantless searches are generally unconstitutional, subject to a few exceptions. *See Cheatham*, 240 Ariz. at 2 ¶ 7. "One such exception allows the warrantless search of an automobile, including containers within, provided an officer has probable cause to believe contraband or evidence will be found." *Id.* Probable cause exists if the facts available to the officer would "'warrant a [person] of reasonable caution in the belief' that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)); *see also id.* at 244 ("All we have required is the kind of 'fair

probability' on which 'reasonable and prudent [people], not legal technicians, act.'" (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 235 (1983))). In evaluating whether probable cause exists, we consider the totality of the circumstances. *See id.* at 244.

¶32 The trial court found probable cause based on Leo alerting to the car. It found that Thompson had consented to the dog-sniff search and, alternatively, that Bratz had reasonable suspicion to walk Leo around the car. *See State v. Driscoll*, 238 Ariz. 432, 434 ¶ 8 (App. 2015) (acknowledging that officers "may not 'extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff'" (quoting *Rodriguez v. United States*, 575 U.S. 348, 353 (2015))).

¶33 Thompson argues the trial court erred by "sid[ing] with the pretextual fantasy of probable cause based on the alleged valid alert by the drug-detection dog." Specifically, Thompson challenges the court's finding that he consented to Bratz walking Leo around the car. He asserts Bratz was "an aggressive trooper looking for a reason to stop and search" and maintains it was "unlikely" Thompson consented to the dog-sniff search after initially refusing to get out of the car and later refusing the request to search the car's interior. Thompson also casts suspicion on Bratz's version of events by pointing out that the dash camera's audio was not working that day, and that Bratz had already requested back up to help search the car before conducting the dog-sniff search.

¶34 We reject Thompson's argument. Bratz's version of events was uncontested at the suppression hearing, and the court found Bratz "very credible in his testimony." Also, Thompson's consent is not far-fetched, as he contends. Thompson did not, in fact, possess illegal drugs, so he had no reason to believe Leo would alert to the car. He therefore may have consented to avoid suspicion. The court acted within its discretion by finding that Thompson consented to Leo's search. *See State v. Fritz*, 157 Ariz. 139, 141 (App. 1988) ("The trial court is the sole arbitrator of the credibility of witnesses.").

¶35 Thompson next argues the trial court erred by finding that Leo's alert provided probable cause for the search. He claims that the fact no drugs were found in the car, together with doubt about the accuracy of Leo's alert, suggests Bratz staged the alert as a pretext for searching the car. As support for this argument, Thompson points to testimony from his expert witness, professional dog trainer Steven Nicely. Nicely testified that based on his review of Leo's training records, Leo was not adequately

trained.    Nicely also testified that Bratz's increase in heartrate and breathing "cued" Leo to alert to Thompson's car.    Nicely admitted this "cue" was not detectable on the traffic-stop video.

¶36        The State presented two rebuttal witnesses, Edward Nicks, a certified trainer from a company that selects, trains, and provides drug-detector dogs to Arizona law enforcement agencies, and Brian Greene, the officer who originally completed basic narcotics detection school with Leo and helped Bratz learn to handle him.    Nicks testified he had reviewed the training records and found the Bratz-Leo team to be appropriately trained. Based on his review of the traffic-stop video, Nicks also opined the stop was consistent with the team's training and that Leo was not cued.    Greene concurred, testifying that Bratz performed an appropriate inspection during the stop and did not cue Leo.    He characterized Bratz and Leo as a highly reliable team.

¶37        The trial court did not err by discarding Nicely's opinions and finding that Leo had properly alerted to the car.    *See Fritz*, 157 Ariz. at 141. Nicely acknowledged he had not worked as a police officer since the 1990s, had not trained police dogs since 2006, had only ever testified on behalf of defendants, and had testified that the dogs involved had been cued "the high majority of the time."    Conversely, Bratz and Greene had worked directly with Leo and were familiar with his training, and Nicks was a certified trainer familiar with Arizona drug-detector dogs.    The training records showed that Bratz and Leo had a 99.6% reliability rate based on criteria used by the state.    And significantly, the traffic-stop video did not show that Leo had been cued.

¶38        Thompson relatedly argues the trial court violated his substantive due process rights by finding probable cause considering Bratz's intent to search the car, Thompson's unlikely consent to the dog-sniff search, and Leo's unreliable alert.    But Thompson offers nothing in addition to his previously made arguments challenging the probable cause finding.    The trial court acted within its discretion and not arbitrarily in crediting the State's witnesses over the defense's witnesses and finding probable cause.

¶39        Thompson finally argues the trial court violated Arizona Rule of Evidence 702 by sustaining the State's foundation objections during defense counsel's direct examination of Nicely.    After Nicely testified that dogs pick up odor on the downwind side of a vehicle, defense counsel twice asked where Leo should have alerted based on the wind conditions on the

day of the stop if drugs had been in Thompson's car. The court sustained the State's foundation objection, reasoning that because Nicely was not present at the stop and "[w]e do not have any conclusion about wind direction, wind speed, et cetera," Nicely's opinion would lack foundation.

**¶40** The court did not abuse its discretion by sustaining the foundation objection. *See Ritchie v. Krasner*, 221 Ariz. 288, 302 ¶ 45 (App. 2009) (applying abuse of discretion standard for trial court's exclusion of evidence based on lack of foundation). Experts may base opinions on facts in evidence. *See* Ariz. R. Evid. 703; *Lynn v. Helitec Corp.*, 144 Ariz. 564, 568 (App. 1984). Earlier in the suppression hearing, Bratz testified the wind was blowing from the southwest at the time of the stop (moving from the right rear of the car toward the left front), as recorded in his report of the stop. But he also testified there were "sporadic gusts of wind" and that passing semi-trucks made odors go in "all sorts of different directions." Nothing in the record addressed the wind conditions at the precise time Leo alerted to the car. Nicely therefore lacked foundation to opine on where Leo should have alerted had drugs been inside the car.

### C.  Precluding molestation evidence

**¶41** Before trial, the State moved to preclude introduction of several categories of evidence concerning the victims and the children as irrelevant and inadmissible under Arizona Rule of Evidence 403. As pertinent here, the trial court precluded evidence that Edwards allegedly participated in molesting Daughter and possibly another child. The court explained that, though "tangibly relevant," this evidence consisted of "vague assertions" that could not pass the Rule 403 balancing test. Specifically, the court found that "[t]hese alleged factual assertions are unfair as they are unproven, uncorroborated by any evidence, and on their surface appear to suggest an improper purpose, and could potentially elicit or suggest emotion, sympathy and horror." We review this ruling for an abuse of discretion. *See Shotwell v. Donahoe*, 207 Ariz. 287, 294 ¶ 27 (2004).

**¶42** The trial court did not abuse its discretion. First, the precluded evidence did not have great probative value. *See State v. Gibson*, 202 Ariz. 321, 324 ¶ 17 (2002) ("The greater the probative value . . . and the more significant in the case the issue to which it is addressed, the less probable that factors of prejudice or confusion can substantially outweigh the value of the evidence." (quoting 1 Joseph M. Livermore, Robert Bartels, & Anne Holt Hameroff, *Arizona Practice: Law of Evidence* (formerly *Udall on Evidence*) § 403 at 82–83, 84–86 (4th ed. 2000))). Notably, the record does not reflect

precisely what evidence was precluded. For example, we know neither the exact content of the evidence nor whether the evidence was testimonial or documentary. All we know is that the evidence consisted of "vague assertions" that lacked corroboration and were unproven.

¶43 Second, other evidence sufficiently demonstrated Thompson's motive to travel to Arizona to protect the children. The court permitted Thompson to introduce evidence of Edwards' past failure to report Daughter's molestation, Edwards' history of illegally using drugs, Son's hospitalization, and Daughter's impending trip to an unsafe location. The precluded, vague evidence would not have added much.

¶44 Conversely, admitting evidence suggesting Edwards had molested her own daughter and another child could have certainly inflamed the jury's passions, resulting in unfair prejudice to the State's case. Indeed, Thompson acknowledged to the trial court that evidence of Edwards' participation in molesting Daughter "is not as essential as the other items of evidence, and may have a greater prejudicial effect under Rule 403." On this slim record, the trial court did not abuse its discretion by finding that this unfair prejudice substantially outweighed any minimal probative value of the evidence.

## II.  Guilt phase issues

### A.  Jury selection

¶45 Thompson argues the trial court conducted voir dire in violation of his Sixth Amendment right to an impartial jury. We review the court's objected-to rulings concerning voir dire for an abuse of discretion. *See State v. Glassel*, 211 Ariz. 33, 45 ¶ 36 (2005); *State v. Smith*, 215 Ariz. 221, 230 ¶ 37 (2007). But whether a question to jurors is allowable under Arizona law is reviewed de novo. *State v. Kayer*, 194 Ariz. 423, 431 ¶ 22 (1999).

¶46 We review unobjected-to rulings for fundamental error. *See Henderson*, 210 Ariz. at 567 ¶ 19. An error is fundamental if "(1) the error went to the foundation of the case, (2) the error took from the defendant a right essential to his defense, *or* (3) the error was so egregious that he could not possibly have received a fair trial." *State v. Escalante*, 245 Ariz. 135, 142 ¶ 21 (2018). If a defendant shows the error was fundamental under prongs one or two, he must also show the error prejudiced him. *Id.* The appropriate inquiry is whether a reasonable jury, but for the error, "could

have plausibly and intelligently returned a different verdict." *Id.* at 144 ¶ 31.

### 1. Scope of questioning

**¶47**        Thompson argues the trial court abused its discretion by limiting his ability to ask prospective jurors about their predisposition to impose the death penalty if he were found guilty.   Specifically, he challenges the trial court's direction that defense counsel refrain from precommitting prospective jurors to positions by asking whether they would never consider certain circumstances, like child abuse, to be mitigating factors.   He also contests the court's rulings prohibiting counsel from asking one juror whether he was "leaning towards life," so the prosecutor would have to convince him that death was the appropriate penalty, and asking another juror whether he would impose the death penalty for certain murders even in the absence of aggravating circumstances.

**¶48**        The Sixth and Fourteenth Amendments guarantee a defendant's right to an impartial jury.   *Morgan v. Illinois*, 504 U.S. 719, 728 (1992).   In a capital case, this includes the right to challenge for cause any prospective juror who would automatically vote to impose the death penalty, or in other words, any juror to whom "the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant . . . ." *Id.* at 729.

**¶49**        *Morgan* is the seminal case governing the scope of voir dire that must be permitted to identify any such prospective jurors.   There, the Court held that "general fairness and 'follow the law' questions" asked by the trial judge were insufficient for determining which jurors would impose the death penalty without regard for mitigation.   *Id.* at 734.   A prospective juror may very well believe himself or herself committed to follow the law, "and yet be unaware that maintaining . . . dogmatic beliefs about the death penalty would prevent him or her from doing so."   *Id.* at 735.   Therefore, although the Supreme Court declined to write a script for defense counsel, it instructed that a defendant must be permitted, upon request, to make sufficient inquiry to determine which prospective jurors may have predetermined to impose the death penalty.   *Id.* at 729.

**¶50**        The trial court here did not violate *Morgan* by directing defense counsel not to ask prospective jurors whether certain facts could never constitute mitigating evidence.   Defense counsel had no right to

"stake out" jurors' views on the types of mitigation they would find unpersuasive to identify jurors who would automatically impose the death penalty upon a finding of guilt alone. *See Smith*, 215 Ariz. at 231 ¶ 42 (explaining that *Morgan* does not empower defense counsel to "ask a juror to speculate or precommit on how that juror might vote based on any particular facts" (quoting *United States v. McVeigh*, 153 F.3d 1166, 1207 (10th Cir. 1998))); *see also Glassel*, 211 Ariz. at 46–47 ¶¶ 39–44 (rejecting argument that *Morgan* entitled defense counsel to ask open-ended questions of jurors about what categories of mitigators would be important to them or to ask them to explain what "sufficiently substantial to call for leniency" meant); *Johnson*, 247 Ariz. at 196 ¶ 102 (concluding *Morgan* did not permit defense counsel to ask prospective jurors what type of evidence they would consider mitigating); *State v. Forde*, 233 Ariz. 543, 561 ¶ 58 (2014) (rejecting argument that the trial court erred by prohibiting defense counsel "from asking prospective jurors both to identify mitigation they would consider sufficient to call for leniency and to opine on whether specific circumstances would constitute such mitigation").

**¶51**        Also, the court allowed defense counsel a sufficient opportunity to question prospective jurors at length and challenge any who appeared unqualified because they were predisposed to impose the death penalty without regard to mitigation.   Questionnaires asked jurors about their views on the death penalty, including whether they were generally or strongly in favor or not in favor of the death penalty or neutral on its imposition and whether "[f]or whatever reason" they would "automatically vote <u>for</u> the death penalty without considering the evidence and the instructions of law."

**¶52**        Defense counsel also individually questioned jurors about any predisposition towards imposing the death penalty.   For example, he provided a hypothetical scenario of an unjustified, premeditated murder and then asked each prospective juror, "what are your feelings about the death penalty being the only appropriate penalty for that guilty murder of that innocent victim?"   And of the sixteen jurors who were seated, fifteen were asked if they would consider all mitigation evidence, and they answered affirmatively.

**¶53**        The trial court also did not err by disallowing the questions to two prospective jurors, *see supra* ¶ 47, because those questions rested on misstatements of the law, which could have confused the venire panel.   As the court pointed out to defense counsel, the prosecution does not have to convince jurors that death is the appropriate penalty, *see State ex rel. Thomas*

*v. Granville*, 211 Ariz. 468, 471 ¶ 11 (2005), and the death penalty cannot be imposed in the absence of aggravating circumstances, *see* A.R.S. § 13-752(E).

### 2. Time limits

**¶54**        Thompson argues the trial court erred at the outset of voir dire by imposing, without objection, a five-minute time limit per party to question each prospective juror, thereby hindering his ability to probe into prospective jurors' views on the death penalty.   But this limitation was abandoned when the court agreed to permit each party to question prospective jurors in small groups rather than individually.   Regardless, the court indicated it was flexible on timing.   And when the venire panel had winnowed to forty people, the court permitted individual voir dire without time constraints.   Significantly, Thompson points to no instance when the court denied his request for more time.   The court did not commit error, much less fundamental error.   *See State v. Acuna Valenzuela*, 245 Ariz. 197, 208 ¶¶ 17–19 (2018) (concluding a trial court did not abuse its discretion by setting time limits for each side at the outset because it was flexible about providing extra time).

### 3. "Packing" and "signaling"

**¶55**        Thompson argues, without apparent objection to the trial court or elaboration here, that "the State was allowed to pack the jury with pro-death jurors" through its questioning.   From our review of the record, the State acted properly by asking prospective jurors whether they would commit to following the law regarding aggravating and mitigating circumstances, and the court acted within its broad discretion by striking jurors for cause who showed a predetermination not to impose the death penalty.   As we have noted, a trial judge may "strike a juror whose views about capital punishment 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"   *State v. Prince*, 226 Ariz. 516, 528 ¶ 27 (2011) (quoting *Wainwright v. Witt*, 469 U.S. 412, 433 (1985)); *see also id.* at 528–29 ¶¶ 26–34 (finding that the trial court acted within its discretion when it struck jurors based on responses to the questionnaire that indicated they would not be willing to impose the death penalty, noting jurors' views do not need to "be proven with 'unmistakable clarity'" (quoting *State v. Ellison*, 213 Ariz. 116, 137 ¶ 89 (2006))).

**¶56**        Thompson relatedly argues the jury pool was "contaminated" because group voir dire permitted the prosecutor to "signal" what kinds of

answers would result in a prospective juror's dismissal.    But defense counsel, when asked by the court, consented to group voir dire. Regardless, the parties moved to strike jurors for cause outside the prospective jurors' presence.    As the court explained, "I certainly don't want to excuse them in the course of questioning so we don't signal what is an appropriate response to be released."    There is no error here.

### 4.    Strikes by the trial court

**¶57**        Finally, Thompson asserts the trial court "repeatedly struck jurors on its own for reasons stated on the record that did not merit immediate dismissal."    But because he fails to develop this argument or even point out which prospective jurors were improperly struck by the court, Thompson has waived this argument.    *See State v. Moody*, 208 Ariz. 424, 452 ¶ 101 n.9 (2004) ("Failure to argue a claim usually constitutes abandonment and waiver of that claim." (quoting *State v. Carver*, 160 Ariz. 167, 175 (1989))).

**¶58**        Alternatively, because Thompson did not object to striking any of the struck jurors (in fact, defense counsel repeatedly stated he had "no objection" to the trial court's strikes), Thompson bears the burden of showing any resulting error was fundamental.    *See Henderson*, 210 Ariz. at 567 ¶ 19.    Because Thompson has not alleged that the jurors were struck for discriminatory reasons or articulated how any of the strikes prejudiced him, he has not met this burden.    *See Escalante*, 245 Ariz. at 142 ¶ 21.

### B.    Expert testimony

**¶59**         Thompson argues the trial court erred by permitting the State to solicit expert opinion testimony from witnesses Ed Bills and John Riley. Because Thompson did not object to the challenged testimony, we review for fundamental error.    *See Henderson*, 210 Ariz. at 567 ¶ 19.

### 1.    Bills

**¶60**        At the time of the murders, Bills was the lead detective for the Prescott Valley Police Department.    By the time of trial, he had retired from the force and was serving as the chief investigator for the Yavapai County Attorney's Office.

**¶61**        Bills testified about "defensive wounds," which occur when victims put their arms up to fend off an assailant's attack.    At issue here,

Bills testified that after viewing pictures of the victims' bodies and the autopsy reports, and "based on [his] training and expertise," Edwards had defensive wounds and Dunn did not.

**¶62**     Thompson argues in his opening brief that Bills' testimony violated Arizona Rule of Evidence 701(c) because he "was not testifying from his perception; he was testifying from an autopsy report and photographs from others." Rule 701(c) prohibits lay witnesses from offering opinion testimony "based on scientific, technical, or other specialized knowledge within the scope of Rule 702," which addresses expert testimony. After the State responded that Bills testified as an expert, Thompson asserted in his reply brief that "Bills opined as an expert without the requisite foundation to do so" because his opinions were not based on sufficient facts or data and were not the product of reliable principles and methods to determine the difference between types of wounds.

**¶63**     An expert witness is someone qualified "by knowledge, skill, experience, training, or education," whose knowledge assists the jury in understanding the evidence, who testifies based on sufficient facts and applies reliable "principles and methods to the facts of the case." Ariz. R. Evid. 702. A qualified expert "need only possess 'skill and knowledge superior to that of [people] in general.'" *State v. Romero*, 239 Ariz. 6, 10 ¶ 17 (2016) (alteration in original) (quoting *State v. Girdler*, 138 Ariz. 482, 490 (1983)). Extensive training is not required but only a degree of expertise in the subject such that "a jury can receive help on a particular subject from the witness." *State v. Davolt*, 207 Ariz. 191, 210 ¶¶ 70, 75 (2004).

**¶64**     Bills testified as an expert, so Rule 701(c) did not apply. He had been in law enforcement for twenty-five years, including seventeen years as a detective who investigated numerous deaths and murders, including those involving guns, knives, and other instruments. Bills testified that as an investigating officer, he had seen "defensive wounds typically from sharp instruments, knives, [and] razors." His knowledge regarding defensive wounds was superior to that of people in general, meaning his insight would have assisted the jury in understanding what they saw in the photographs. *See id.* ¶¶ 73–76 (finding no error in the admission of blood spatter analysis testimony by a detective who, as part of his advanced training for the police force, had taken classes in crime scene management and homicide investigation and had watched two training videos about blood spatter analysis); Ariz. R. Evid. 702. The sufficiency of Bills' training went to the weight of his testimony, not its

admissibility. *See Davolt*, 207 Ariz. at 210 ¶ 70. The trial court did not commit error, much less fundamental error, by permitting Bills' testimony regarding defensive wounds. And even assuming fundamental error, Thompson has not shown prejudice. Forensic pathologist Dr. William Stano corroborated Bills' explanation of defensive wounds and that Edwards' body exhibited them. The jury could not plausibly have reached a different verdict had Bills' testimony been precluded. *See Escalante*, 245 Ariz. at 144 ¶ 31.

## 2. Riley

¶65 Riley was the evidence technician for the Prescott Valley Police Department and also processed crime scenes by taking photographs, lifting fingerprints, collecting DNA, calculating bullet trajectory, and the like. Thompson argues Riley was not qualified as an expert to offer opinions that a small hatchet found at the murder scene had a "chemical smell and what appear[ed] to be blood and human tissue on the hatchet itself," or that Edwards' body showed evidence of "blunt force—severe trauma, impact trauma, of being struck" with a "sharp instrument."

¶66 Riley's opinion about the look and smell of the hatchet was clearly based on his perception of the hatchet at the crime scene, assisted the jury in determining what the evidence showed, and was not based on scientific, technical, or other specialized knowledge. *See* Ariz. R. Evid. 701. He did not identify the smell or definitively opine that the substance on the hatchet was human tissue. As such, the opinion was admissible as a lay opinion. *See id.*

¶67 Riley's experience and training also qualified him to offer these opinions as an expert. Riley worked for the Prescott Valley Police Department for seventeen years, eventually becoming the department's head evidence technician. Before that, he worked for the Phoenix Police Department for twenty-five years, spending fifteen of those years as a sergeant supervising investigative squads in homicide, vice, burglary, and robbery details. He also oversaw evidence collection during Phoenix Police homicide investigations. This experience provided him with superior knowledge to distinguish between blunt force and sharp instrument injuries. *See Davolt*, 207 Ariz. at 210 ¶ 70. The trial court did not commit error, much less fundamental error, by permitting the challenged testimony.

¶**68**      Even assuming error, Thompson has not shown prejudice. Dr. Stano corroborated Riley's testimony by describing the difference between "blunt force" and "sharp force" wounds and explaining that the presence of both indicates that the injuries were likely caused by a heavy object with a sharp edge, like an axe or a hatchet. Dr. Stano also testified that Edwards' body had both blunt force and sharp force wounds. The jury could not plausibly have reached a different verdict had Riley's testimony been precluded. *See Escalante*, 245 Ariz. at 144 ¶ 31.

### C.   Admission of in-life photo

¶**69**      Thompson argues the trial court erred by admitting an in-life photo of the victims in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights and article 2, sections 4 and 24 of the Arizona Constitution. Thompson further argues the photo was irrelevant and unduly prejudicial because it showed a happy, engaged couple. We review the admission of in-life photos for an abuse of discretion. *See Ellison*, 213 Ariz. at 141 ¶ 115.

¶**70**      Trial courts follow a three-step process to determine whether to admit an in-life photo. *See State v. Doerr*, 193 Ariz. 56, 64 ¶ 29 (1998). The court initially must decide if the photo is relevant. *Id.* If it is, the court must then consider "whether the photograph has a tendency to inflame or incite passion in the jurors." *Id.* The probative value of the photo must then be weighed against the risk of unfair prejudice. *Id.; see also* Ariz. R. Evid. 403. Courts have broad discretion in deciding whether to admit photos. *See State v. Spreitz*, 190 Ariz. 129, 141 (1997).

¶**71**      The trial court did not abuse its broad discretion here. The photo had slight relevance in depicting the victims before they incurred their injuries. But as the trial court observed, the photo could "shed light on the circumstances, given the gruesome photographs the jury [would] be viewing." *See Doerr*, 193 Ariz. at 64 ¶ 32 (observing it is not inappropriate to "personalize the victim and help to complete the story for the jurors," as long as the photos do not "undermin[e] the defendant's right to an objective determination of guilt or innocence").

¶**72**      We cannot say the court erred by finding that the photo's probative value was not substantially outweighed by a risk of unfair prejudice. *See* Ariz. R. Evid. 403. The photograph, chosen among others rejected by the court as overly emotional, merely showed Dunn and Edwards smiling at the camera and leaning toward each other over a large

rock. *See Ellison*, 213 Ariz. at 141 ¶ 115 (stating photos that are "'benign' as compared to the victims' post-death photos" are generally not at risk of being unfairly prejudicial). The court also minimized any risk of unfair prejudice by instructing the jury it "[m]ust not be influenced by sympathy or prejudice." *See State v. Carson*, 210 Ariz. 54, 71 ¶¶ 85–87 (2005).

¶73        Alternatively, even if the court erred in admitting the photograph, the error was harmless because it did not materially contribute to or affect the verdict. *See Doerr*, 193 Ariz. at 64 ¶ 33. Just as we found in *Doerr*, "[g]iven the overwhelming physical evidence introduced at trial and the benign nature of the photograph itself, we conclude that this exhibit did not materially affect the outcome of the case." *Id.*

### D.   Prosecutorial error

¶74        Thompson argues his convictions were tainted by two instances of prosecutorial error that individually and cumulatively violated his Fifth, Sixth, and Fourteenth Amendment rights. Specifically, he asserts that during rebuttal closing argument, the prosecutor improperly commented on Thompson's right not to testify and appealed to a manufactured duty owed to the victims' families.

¶75        To prevail on a claim of prosecutorial error, a defendant must show "that the prosecutor's [error] so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Murray*, 250 Ariz. 543, 548 ¶ 13 (2021) (quoting *State v. Morris*, 215 Ariz. 324, 335 ¶ 46 (2007)). To do so, the defendant must demonstrate that (1) prosecutorial error exists; and (2) "a reasonable likelihood exists that the [prosecutorial error] could have affected the jury's verdict, thereby denying defendant a fair trial." *Id.* (quoting *State v. Anderson* (*Anderson II*), 210 Ariz. 327, 340 ¶ 45 (2005)).

### 1.   Comment on the right not to testify

¶76        During the rebuttal closing argument, the prosecutor said the following, referring to defense counsel's theory that the murders were crimes of passion that occurred following an emotionally charged conversation between Thompson and the victims:

> Instead of discussing the evidence in painstaking fashion as I did in my original closing argument, counsel asks you to speculate again and again and again and again.

Few of those examples. There was some sort of conversation in the house between the defendant and Troy and Penny. Defendant came here with money. He was going to offer money for the kids, that Penny reacted emotionally to whatever this conversation that occurred in the house. Penny and Troy reacted emotionally. Clearly something went on in that house.

Is Penny considering this offer that there is no evidence for? Does she get mad? Does she yell and scream? Something more happened in that house, some sort of fight or altercation. Speculation.

***Two out of the three people that were in that house and know what happened are dead. The only other person is the defendant.***

(Emphasis added). Defense counsel objected, and the court called a sidebar conference wherein the prosecutor assured the court he planned to comment on Thompson's statements to police, not his failure to testify. After the sidebar, the prosecutor continued his argument by stating, "In the defendant's statements that he gave to the police that we've established is full of lies, it doesn't mention any of these things." The prosecutor then went on to discuss the lack of evidence of the emotional altercation that defense counsel asked the jury to assume took place. No mention was made of Thompson's decision not to testify.

¶77 A prosecutor is prohibited by the Fifth Amendment, its Arizona counterpart, Ariz. Const. art. 2, § 10, and A.R.S. § 13-117(B) from directly or indirectly bringing to the jury's attention that the defendant did not testify. *See Griffin v. California*, 380 U.S. 609, 615 (1965); *see also State v. Schrock*, 149 Ariz. 433, 438 (1986). As relevant here, we have held that a prosecutor cannot point out that the defendant supplied no evidence concerning a factual circumstance if the defendant is the only person who could provide that evidence because that serves as a comment on the defendant's failure to testify. *See State v. Fuller*, 143 Ariz. 571, 575 (1985) ("The prosecutor may properly comment upon the defendant's failure to present exculpatory evidence, so long as the comment is not phrased to call attention to the defendant's own failure to testify. An exception to this

rule occurs when it appears that the defendant is the only one who could explain or contradict the state's evidence." (internal citation omitted)).

¶78 We examine challenged statements in context to determine whether "the jury would naturally and necessarily perceive them to be a comment on the failure of the defendant to testify." *Schrock*, 149 Ariz. at 438. "Further, to be constitutionally improper, the comment must (1) be adverse, in that it supports an unfavorable inference against the defendant, and (2) operate as a penalty for defendant's exercise of his constitutional right." *Id.*

¶79 The prosecutor's argument here did not constitute a comment on Thompson's decision not to testify and was therefore proper. Defense counsel challenged the State's premeditation evidence during closing argument, arguing the evidence also supported a finding that Thompson killed the victims in the "heat of passion" after "a highly emotional conversation" between the three about the children and while the victims were either high on heroin or withdrawing from it. But Thompson had told police he had interrupted an altercation between the victims, not that he killed them during an emotional confrontation about the children. The prosecutor relied on that statement—not Thompson's failure to testify—as suggesting that his crime-of-passion defense to premeditated murder was implausible. In context, the jury would not have naturally and necessarily perceived the argument as a comment on Thompson's decision not to testify. *See id.*

## 2. Appealing to a duty owed to victims' families

¶80 Also during rebuttal closing argument, the prosecutor stated, "[W]e know who the defendant is. He's a cold-blooded, brutal murderer times two. That's who he is. If you do not find the defendant guilty of first degree premeditated murder for Troy and Penny, *you failed their families*." (Emphasis added.) Defense counsel objected and moved to strike the statement. The court sustained the objection, struck the statement, and advised the jury, "You will disregard that last comment." After the prosecutor concluded his rebuttal closing, defense counsel asked to approach and made an oral motion for a mistrial because the prosecutor "[knew] better than to make that comment in front of a jury," and because failing the victims' families is an improper basis for a conviction. The court denied the motion on the grounds that the appropriate remedy had already been administered.

**¶81** A prosecutor's statements are improper if (1) they call attention to matters that jurors should not consider in reaching their verdict, and (2) create a high probability that the jurors are, in fact, influenced by those statements. *See State v. Hulsey*, 243 Ariz. 367, 391 ¶ 109 (2018). The prosecutor's statement that the jury should return a guilty verdict on premeditated murder to avoid failing the victims' families was clearly improper and, frankly, inexcusable for an experienced prosecutor. Whether the victims' families are served or harmed by a particular verdict is not a consideration in reaching that verdict, and suggesting jurors owed a duty to victims' families that can only be met by a guilty verdict on premeditated murder constituted an emotional appeal that carried a high likelihood of influencing jurors. *See State v. Bible*, 175 Ariz. 549, 602–03 (1993) (concluding that prosecutor erred by imploring the jury to protect the victim's rights and reasoning that "[a] jury in a criminal trial is not expected to strike some sort of balance between the victim's and the defendant's rights," and "[t]he statements encouraged the jury to decide the case on emotion and ignore the court's instructions"); *see also Acuna Valenzuela*, 245 Ariz. at 223 ¶ 117 ("The statement asking the jury to do 'justice for Edgar' was arguably inappropriate insofar as it asked the jury to 'strike some sort of balance between the victim's and the defendant's rights.'" (quoting *Bible*, 175 Ariz. at 603)). The prosecutor here needlessly and impermissibly jeopardized Thompson's due process rights. The trial court correctly struck the statement and instructed the jury to ignore it. *See Bible*, 175 Ariz. at 603.

**¶82** The State does not contest the trial court's ruling. Instead, it argues the court correctly denied the motion for mistrial because the comment did not so infect the trial with unfairness as to make the verdict a denial of due process. Thompson does not offer any meaningful counterargument, simply stating that the curative instruction was insufficient.

**¶83** We agree with the State. The prosecutor's comment was isolated and brief, and the court immediately struck it and instructed the jury to disregard it. The court's actions cured any sting from the comment. *See State v. Lynch*, 238 Ariz. 84, 100 ¶ 48 (2015), *rev'd on other grounds*, 578 U.S. 613 (2016) ("The proper response to an improper prosecutorial comment is an objection, motion to strike, and a jury instruction to disregard the stricken comment."); *State v. Newell*, 212 Ariz. 389, 403 ¶ 69 (2006) (finding an instruction that the jury must disregard statements after a sustained objection curative even where the jury was not told to disregard the statements at the time of the objection and noting that juries are

presumed to follow instructions). Under these circumstances, there is not a reasonable likelihood that the statement could have affected the jury's verdict, thereby depriving Thompson of a fair trial and requiring a reversal. *See Murray*, 250 Ariz. at 548 ¶ 13.

¶84 Finally, Thompson asserts in conclusory fashion that the statements here were also improper because they misstated the law, shifted the burden of proof, impugned the integrity of the defense, improperly argued inferences and conclusions during closing, vouched for the victims, vouched by implying facts not in evidence, and appealed to the jurors' fears. Because these arguments are not developed, Thompson has abandoned and waived them. *See State v. Vargas*, 249 Ariz. 186, 191 ¶ 22 (2020).

¶85 Because we conclude that only one instance of prosecutorial error occurred here, there is no need to address cumulative error.

### III.   Aggravation phase

### A.   (F)(13) aggravator

¶86 Thompson argues the trial court abused its discretion and violated his Eighth Amendment rights by denying his Rule 20 motion made at the close of evidence to enter a judgment that the (F)(13) "cold and calculated" aggravator was unproven.[6]  *See* Ariz. R. Crim. P. 20(a)(2).  We review the court's ruling on a Rule 20 motion de novo.  *State v. Escalante-Orozco*, 241 Ariz. 254, 282 ¶ 104 (2017), *abrogated on other grounds by State v. Escalante*, 245 Ariz. 135 (2018).

¶87 Rule 20(a)(2) requires the trial court to enter a judgment that an aggravating circumstance is unproven "if there is no substantial evidence to support the allegation." "Substantial evidence" exists if reasonable persons could find the evidence, both direct and circumstantial, sufficient to support the existence of the aggravator beyond a reasonable doubt.  *See State v. (Randall) West*, 226 Ariz. 559, 562 ¶ 16 (2011).  In

---

[6]     Thompson also challenges the court's denial of his pretrial motion made on the same basis pursuant to Arizona Rule of Criminal Procedure 16.1(b).  But he doesn't develop a separate Rule 16.1 argument and, indeed, the issues appear identical.  Our disposition of the Rule 20 issue resolves Thompson's challenge to the Rule 16.1 ruling.

determining whether substantial evidence exists, we view the evidence in the light most favorable to the prosecution.   *See id.*

**¶88**        The (F)(13) aggravator requires the state to prove beyond a reasonable doubt that "[t]he offense was committed in a cold, calculated manner without pretense of moral or legal justification."    A.R.S. § 13-751(B), (F)(13).    In *State v. Hausner*, we held that the "cold and calculated" part of the aggravator was unconstitutionally vague, but it could be cured with proper jury instructions.    230 Ariz. 60, 82–83 ¶¶ 102–03 (2012).    Rather than arguing that the curative instructions here were unhelpful, Thompson argues the State failed to prove that the murder was committed "without pretense of moral or legal justification."

**¶89**        Our cases have not extensively addressed what constitutes a "pretense of moral or legal justification."    In *Hausner*, the trial court, like the court here, instructed the jury that "without pretense of moral or legal justification" means "anything of justification or excuse that, though insufficient to reduce the degree of murder, nonetheless rebuts the otherwise cold, calculated nature of the murder."    *Id.* at 83–84 ¶ 109.    The defendant there challenged the court's failure to explain what legal justifications existed under Arizona law.    *Id.* at 84 ¶ 109.    We rejected that argument, explaining it "mistakenly presumes that the jury could only consider legally recognized justifications" when, in fact, (F)(13) "refers more broadly to a 'pretense' of legal or moral justification, and the trial court reasonably defined this as 'anything of justification or excuse.'"    *Id.*

**¶90**        Thompson argues substantial evidence did not exist that he lacked a pretense of legal or moral justification for killing the victims because both he and the State "presented evidence and argument that [he] went to the home because he wanted to take the law into his own hands and rescue the children from the victims."    Thompson does not specify what evidence supports this assertion, and we are not aware of any direct evidence to this effect, although a reasonable juror could have drawn this inference.    Indeed, the only direct evidence of Thompson's reasoning was his statement to officers that he killed Dunn to protect Edwards.

**¶91**        We agree with the trial court that a reasonable juror could also have drawn an inference from the evidence that Thompson lacked a pretense of legal or moral justification for killing the victims.    Thompson's trip to Arizona coincided with him learning Gloria was upset about Daughter's risky travel plans and Son's hospitalization, she wanted to have the children placed with her, and that she was considering hiring a lawyer

to assist in that effort.   Viewing this evidence in the light most favorable to the State, a reasonable person could conclude Thompson murdered the victims not for the altruistic purpose of rescuing the children, but simply to regain custody of them without having to hire a lawyer and proceed through the courts.   Although these could be motives for the murders, they would not constitute a pretense of legal or moral justification.   The trial court did not err by denying Thompson's Rule 20 motion and permitting the jury to decide whether the State had proven the (F)(13) aggravator.

¶92        Furthermore, any error was harmless.   The State bears the burden of "prov[ing] beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence."   *See Henderson*, 210 Ariz. at 567 ¶ 18.   It has satisfied that burden here.   Use of the (F)(13) aggravator did not allow the jury to consider any otherwise inadmissible evidence.   *See Hausner*, 230 Ariz. at 84 ¶ 113 (explaining harmless error can exist when an inapplicable aggravator is used "so long as the error[] do[es] not permit the sentencer to consider otherwise inadmissible evidence" (citing *Clemons v. Mississippi*, 494 U.S. 738, 754 n.5 (1990))).   Also, it was only one of five aggravators found by the jury for each murder.   We have before held that the multiple homicides aggravator, found here, is given "extraordinary weight."   *State v. Poyson*, 250 Ariz. 48, 57 ¶ 43 (2020); *State v. Dann* (*Dann II*), 220 Ariz. 351, 376–77 ¶ 153 (2009).   The cruelty aggravator, also found here, is also "entitled to great weight."   *Poyson*, 250 Ariz. at 57 ¶ 42 (quoting *State v. McKinney* (*McKinney I*), 245 Ariz. 225, 228 ¶ 15 (2018)).   Given the weight and number of other aggravators the jury found and the proffered mitigation evidence, *see infra* § IV(B)(2), the jury clearly would have imposed the death penalty even absent the (F)(13) aggravator.

## IV.   Constitutionality of death penalty

### A.   Felony murder

¶93        Thompson argued in his opening brief that imposing the death penalty for the first degree felony-murder counts violated his due process rights under the Fifth Amendment and article 2, section 4 of the Arizona Constitution as well as the Eighth Amendment and article 2, section 15 of the Arizona Constitution.   Specifically, he asserted that because the felony murders were based on an underlying felony (burglary) that did not require a specific intent to kill, the death penalty was not constitutionally imposed.

¶94        In his reply brief, Thompson concedes that imposing the death penalty without a finding of premeditation is constitutional. We agree and therefore accept the concession. *See State v. McLoughlin*, 139 Ariz. 481, 486 (1984) ("It is not unconstitutional for the Arizona Legislature to mandate that an individual who causes the death of another while seeking to accomplish one of several enumerated felonies, each of which requires a showing of intent and/or knowledge for conviction, be subject to the same criminal charges and punishment as a person who causes the death of another person with premeditation."); *State v. Herrera*, 176 Ariz. 21, 30 (1993) ("Arizona's felony murder rule is not unconstitutional."); *see also State v. (Thomas) West*, 176 Ariz. 432, 445 (1993) ("The felony-murder rule, designed as it is to protect human life, represents sound public policy, is reasonably related to the end sought to be accomplished and is not constitutionally impermissible." (quoting *State v. Celaya*, 135 Ariz. 248, 255 (1983))), *overruled on other grounds by State v. Rodriguez*, 192 Ariz. 58, 64 ¶ 30 n.7 (1998).

¶95        Furthermore, any error was harmless. The jury also found Thompson guilty of premediated murder of both victims and imposed the death penalty for those convictions. *See Anderson II*, 210 Ariz. at 343 ¶ 59 ("In any event, the jury returned separate guilty verdicts for both felony murder and premeditated murder as to each victim; therefore, the first-degree murder convictions would stand even absent a felony murder predicate.").

## B.   Abuse of discretion review

¶96        Because Thompson committed the murders after August 1, 2002, this Court must review the jury's findings of aggravating circumstances and the imposition of a death sentence for an abuse of discretion. A.R.S. § 13-756(A). We view the facts in the light most favorable to sustaining the verdict. *State v. Naranjo*, 234 Ariz. 233, 249 ¶ 81 (2014). A finding of aggravating circumstances or the imposition of a death sentence is not an abuse of discretion if there is "any reasonable evidence in the record to sustain it." *Morris*, 215 Ariz. at 341 ¶ 77 (quoting *State v. Veatch*, 132 Ariz. 394, 396 (1982)). This Court must uphold a death sentence "if any 'reasonable juror could conclude that the mitigation presented was not sufficiently substantial to call for leniency.'" *Naranjo*, 234 Ariz. at 250 ¶ 89 (quoting *State v. Gallardo*, 225 Ariz. 560, 570 ¶ 52 (2010)).

### 1. Aggravating circumstances

¶97　　　The State alleged, and the jury found beyond a reasonable doubt, five aggravating circumstances. *See supra* ¶¶ 18–19. Except for the (F)(13) aggravator arguments addressed and rejected above, Thompson does not assert the jury abused its discretion in finding the aggravating circumstances. From our review of the record, we conclude that reasonable evidence exists to sustain the jury's finding that the State proved each aggravator beyond a reasonable doubt. *See Morris*, 215 Ariz. at 341 ¶ 77.

### 2. Propriety of the death sentences

¶98　　　The jury also did not abuse its discretion in finding that death was an appropriate sentence. Thompson presented evidence of twenty-five non-statutory mitigating circumstances. Significantly, defense counsel sought to present Thompson as the survivor of a dysfunctional childhood whose indoctrination in Scientology and undiagnosed autism caused him to have a difficult time processing emotions, interpreting facial expressions, and coping with emotionally charged situations without becoming overwhelmed. Thompson himself gave an allocution that lasted over three hours. He described his personality, his "black and white" thinking, his intelligence, and his concern for Daughter and Son. Notably, he said twice he was not sorry that Dunn and Edwards were dead, and he told the jurors it was "okay" if they gave him the death sentence.

¶99　　　A reasonable juror could conclude that many of the mitigators presented, such as "poverty," "death of family members," "important life documents destroyed," and "educational instability," were weak, and that none of the mitigators was "sufficiently substantial to warrant leniency," considering the number of aggravators and Thompson's own admission he was not sorry the victims were dead. *See Naranjo*, 234 Ariz. at 250 ¶ 89. The jury did not abuse its discretion in finding that the death penalty was appropriate.

## V. Issues raised to avoid preclusion

¶100　　　Thompson raises twenty-one other claims to avoid their preclusion. As Thompson concedes, this Court has previously rejected each claim. Considering the lack of developed arguments from Thompson, we do not address them. *See Vargas*, 249 Ariz. at 191 ¶ 22.

## CONCLUSION

**¶101**      For the foregoing reasons, we affirm Thompson's convictions and sentences.