IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA EX REL. RACHEL H. MITCHELL,
MARICOPA COUNTY ATTORNEY,
*Petitioner*,

*v.*

HON. DAVID J. PALMER, JUDGE OF THE SUPERIOR COURT OF THE STATE OF
ARIZONA, IN AND FOR THE COUNTY OF MARICOPA,
*Respondent Judge,*

TAMIRA MARIE DURAND,
*Real Party in Interest.*

No. CR-21-0397-PR
Filed April 11, 2024

Appeal from the Superior Court in Maricopa County
The Honorable David J. Palmer, Judge
Nos. CR2019-005593-001; CR2020-001680-002
**REVERSED AND REMANDED**

Order of the Court of Appeals, Division One
Filed December 9, 2021
No. 1 CA-SA 21-0241
**VACATED**

COUNSEL:

Rachel H. Mitchell, Maricopa County Attorney, Krista Wood (argued), Amanda Parker, Deputy County Attorneys, Phoenix, Attorneys for State of Arizona

Michael P. Denea (argued), Michael P. Denea, PLC, Phoenix, Attorney for Tamira Marie Durand

Kristin K. Mayes, Arizona Attorney General, Joshua Bendor, Solicitor General, Alice M. Jones, Deputy Solicitor General, Section Chief of Criminal Appeals, Joshua C. Smith, Assistant Attorney General, Phoenix, Attorneys for Amicus Curiae Arizona Attorney General

---

JUSTICE BEENE authored the Opinion of the Court, in which VICE CHIEF JUSTICE TIMMER and JUSTICES BOLICK, LOPEZ, and KING joined.[*]

---

JUSTICE BEENE, Opinion of the Court:

¶1 A prosecutor's conflict of interest erodes confidence in the judicial system and undermines the fairness of criminal trials. Courts must preserve the reality—and appearance—of fairness by disqualifying a prosecutor when such conflicts arise. Here, we examine a unique prosecutorial situation: when a crime victim works in the same office responsible for prosecuting the individual accused of the crime. In this Opinion, we explicate the factors trial courts should consider when deciding whether to disqualify the entire prosecutor's *office* when such a situation arises.

¶2 Forty years ago, this Court outlined four factors that a trial court should consider when deciding whether the appearance of impropriety should disqualify counsel. *Alexander v. Superior Court*, 141 Ariz. 157, 165 (1984). Two years later, in *Gomez v. Superior Court*, 149 Ariz. 223, 226 (1986), this Court reiterated these factors—now commonly known as the *Gomez* factors—as "matters a court must consider when ruling upon

---

[*] Chief Justice Robert M. Brutinel and Justice William G. Montgomery have recused themselves from this matter.

a motion to disqualify opposing counsel." In *State v. Marner ex rel. County of Pima*, 251 Ariz. 198, 200 ¶ 11 (2021), we clarified that a court must apply the *Gomez* factors "whenever a defendant seeks to disqualify an entire prosecutor's office."

¶3        The trial court here did not consider the *Gomez* factors when disqualifying the Maricopa County Attorney's Office ("MCAO"). We, therefore, vacate the trial court's disqualification order and remand for an application of the *Gomez* factors, as well as for consideration of Durand's due process rights, as articulated in this Opinion.

## BACKGROUND

¶4        In two separate indictments, a grand jury indicted Tamira Durand for several fraud-related offenses. One indictment alleged that Durand illegally obtained a credit card in the name of Scott Blum. *See* A.R.S. § 13-2310. Blum is a prosecutor with MCAO—the agency responsible for prosecuting Durand.

¶5        To resolve the case, the State offered Durand two plea agreements. Displeased with the State's offer, Durand responded by submitting a plea deviation request seeking to reduce the time she would spend incarcerated under the agreements. In her request, Durand raised the "inherent possibility of conflict" because Blum, one of the listed victims in her case, appeared to be a prosecutor with MCAO. If he was, Durand indicated that "it would be proper for the Maricopa County Attorney's Office to withdraw from representation and enlist another agency to prosecute this case."

¶6        In response, MCAO admitted that Blum was a prosecutor with the office but nevertheless denied Durand's request. When denying her deviation request, MCAO informed Durand that there was no possibility of conflict because Blum worked in a separate division of the office and had been "walled off from the beginning" of the case.

¶7            The parties then participated in a settlement conference to further discuss the possibility of resolving the case by plea agreement.[1] Before the conference, Durand's counsel again raised the issue of MCAO's purported conflict. In response, the prosecutor suggested that the matter be continued to address the alleged conflict, but Durand declined. Instead, Durand asked to proceed, waiving any potential conflict for the limited purpose of discussing a possible settlement.

¶8            After several unsuccessful settlement attempts, Durand filed a motion to disqualify MCAO, alleging that Blum's status as a listed victim created a conflict of interest. She argued that her "due process rights will be violated if she is prosecuted by an agency with a conflict of interest" and that "there may be pressure to extend an offer that is less favorable to the defendant or even force the case to trial" because of Blum's involvement. In its response, the State asserted that Blum's alleged conflict was not imputed to the entire office, there was no appearance of impropriety, and that the prophylactic screening procedure implemented by MCAO to avoid a conflict was adequate.

¶9            The trial court granted Durand's motion, concluding that the "interest of justice" warranted disqualification. But the court did not invoke *Gomez* or consider the *Gomez* disqualification factors in its order. Even so, the court ordered MCAO to transfer the prosecution of this case to another prosecutorial agency in Arizona.

¶10           The State subsequently filed a petition for special action with the court of appeals. The court accepted jurisdiction but denied relief. The State then petitioned for review. We granted review because the question of whether a prosecutor's office should be disqualified when an employee is a victim in its criminal case is an issue of statewide importance and likely to recur. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

---

[1]   Durand alleges that Blum attended this, as well as a subsequent, settlement conference. The record before us, however, does not conclusively establish whether this occurred.

## DISCUSSION

**¶11**        We apply an abuse of discretion standard to a trial court's decision to disqualify counsel. *Marner*, 251 Ariz. at 200 ¶ 8. However, "[w]e review conclusions of law de novo." *Id.* "An error of law in reaching a discretionary conclusion may constitute an abuse of discretion." *State v. Chambers*, 255 Ariz. 464, 467 ¶ 13 (2023) (quoting *State v. Thompson*, 252 Ariz. 279, 290 ¶ 26 (2022)).

**¶12**        The party seeking disqualification must demonstrate that the requested remedy is appropriate. *State ex rel. Romley v. Superior Court*, 184 Ariz. 223, 228 (App. 1995). This is because a party should only "be allowed to interfere with the attorney-client relationship of his opponent" in "extreme circumstances." *Alexander*, 141 Ariz. at 161.

### I.

**¶13**        When ruling on a motion to disqualify opposing counsel, a trial court must consider the four *Gomez* factors:

> (1) whether the motion is being made for the purposes of harassing the defendant, (2) whether the party bringing the motion will be damaged in some way if the motion is not granted, (3) whether there are any alternative solutions, or is the proposed solution the least damaging possible under the circumstances, and (4) whether the possibility of public suspicion will outweigh any benefits that might accrue due to continued representation.

*Gomez*, 149 Ariz. at 226 (quoting *Alexander*, 141 Ariz. at 165).

**¶14**        But Durand did not merely seek to disqualify opposing counsel; she sought to disqualify an entire prosecutorial office. Our guidance in *Marner* governs this situation. There, we clarified how a trial court should analyze a defendant's request to disqualify a prosecutor's office. We concluded that "the trial court should consider [the *Gomez*] factors whenever a defendant seeks to disqualify an entire prosecutor's office, regardless of whether the basis for the motion is a conflict of interest,

misconduct, or [the] appearance of impropriety." *Marner*, 251 Ariz. at 200 ¶ 11. We explained that the trial court should conduct this analysis because it is most familiar with the facts of a case, and "is in the best position to determine whether an appearance of impropriety is sufficient to undermine public confidence," and consequently, "whether disqualification is appropriate under the circumstances." *Id.* ¶ 12. Therefore, trial courts must consider the *Gomez* factors when ruling on a motion to disqualify a prosecutor's office. *Id*.

**¶15** Here, the State points out that the trial court failed to even consider the *Gomez* factors when it evaluated Durand's motion to disqualify MCAO. Instead, the court summarized the parties' disqualification arguments before granting Durand's motion "in the interest of justice." This was error. *See Chambers*, 255 Ariz. at 468 ¶ 17 (concluding the trial court erred in granting motion to disqualify prosecutor's office without considering *Gomez* factors). And this error prevents us from meaningfully reviewing the court's ruling.

**¶16** Accordingly, we reverse the trial court's order disqualifying MCAO and remand for it to evaluate Durand's motion by applying the *Gomez* factors. However, the circumstances of this case implicate the defendant's due process rights as well as the victim's rights under the Arizona Constitution. We therefore emphasize that the trial court should assess those rights within the *Gomez* framework. We now explain this process.

## II.

**¶17** In Arizona, both criminal defendants and crime victims enjoy constitutional protections. Due process requires that a criminal defendant receive a fundamentally fair trial. *California v. Trombetta*, 467 U.S. 479, 485 (1984) ("Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness."); *accord State v. Melendez*, 172 Ariz. 68, 71 (1992) ("The touchstone of due process under both the Arizona and federal constitutions is fundamental fairness."). A defendant's right to a fundamentally fair trial is critically important because it "preserves both

the appearance and reality of fairness, 'generating the feeling, so important to a popular government, that justice has been done.'" *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 172 (1951) (Frankfurter, J., concurring)).

¶18        Concomitantly, the Arizona Constitution protects a crime victim's right to justice and due process in the Victims' Bill of Rights (the "VBR"). The VBR and its implementing legislation grant victims extensive rights, including the right to be informed of—and attend—all criminal proceedings where the defendant has a right to be present. Ariz. Const. art. 2, § 2.1(A)(3); *see also* A.R.S. §§ 13-4405 to -4427. Victims also have the right to refuse interviews as well as depositions, and have specific privacy rights, including the right to certain safeguards to minimize contact with the defendant, and to prevent the release of personally identifying information. Ariz. Const. art. 2, § 2.1(A)(5); *see also* A.R.S. §§ 13-4430, -4431, -4433, -4434. Moreover, in conjunction with these rights, this Court has emphasized that the VBR requires the state to communicate with the victim throughout a criminal proceeding to ensure that the victim's rights are preserved. *State v. Lamberton*, 183 Ariz. 47, 50 (1995).

¶19        In this case, Durand argued that her "due process rights will be violated if she is prosecuted by an agency with a conflict of interest." The State disagrees, asserting that a conflict does not exist and that the *Gomez* factors militate against disqualification. The State further maintains that it has "done everything in its power to eliminate any appearance of impropriety by implementing an effective screen since the beginning of the case." In its amicus brief, the Attorney General agrees with the State and adds that "[t]he creation and maintenance of an ethical screen is a classic example of an alternative solution that ameliorates any potential harm and ensures that an ethical conflict has no impact on a client's representation by the remaining lawyers in an organization." MCAO and the Attorney General rely on *Romley* to support their contention that the screening procedure put in place sufficiently protects Durand's right to a fair trial. But their reliance is misplaced.

¶20        In *Romley*, MCAO hired a former defense attorney as a deputy county attorney. 184 Ariz. at 225. MCAO then adopted screening

7

procedures to protect against inadvertent disclosure of confidential information and instructed its new prosecutor not to discuss any previous representation of criminal defendants with MCAO employees. *Id.* at 226.

**¶21** In recognizing that an effective screening procedure may be sufficient to defeat a motion to disqualify, the *Romley* court explained that a successful screen "must be designed both to eliminate opportunities for inadvertent disclosure and to provide a genuine appearance of a security wall around the subject attorney." *Id.* at 228. That is, a successful screen must preserve both the reality *and* appearance of fairness. After this explanation, the court of appeals vacated the trial court's order disqualifying the prosecutor's office, concluding that MCAO's screening procedure was adequate because (1) it prohibited the new prosecutor from interacting with MCAO attorneys who were prosecuting his former clients, and (2) it instructed all MCAO employees not to discuss the new prosecutor's previous cases with him. *Id.* at 230.

**¶22** The screening procedure approved in *Romley* is not adequate here, however, for two reasons. First, the screening in *Romley* was established to prevent MCAO's vicarious disqualification because the subject attorney had "participated personally and substantially" in certain ongoing cases "while in private practice." *See id.* at 226 (quoting Ariz. R. Sup. Ct. 42, Ethical Rule ("ER") 1.11). Here, Blum's conflict—which may give rise to an appearance of impropriety—is that, as a victim, he "is likely to be a necessary witness" in Durand's trial. *See* Ariz. R. Sup. Ct. 42, ER 3.7(a). Unlike in *Romley*, where the subject attorney had a previous attorney-client relationship with the defendants being prosecuted by MCAO, Blum's conflict does not arise from a prior client relationship but from his own interest as a victim. Because of this, screening efforts may impact whether an appearance of impropriety exits, but they do not necessarily insulate an office from a conflict. *See Romley*, 184 Ariz. at 229 ("The premise underlying the non-disqualification policy of ER 1.11(c) is that a prosecutor usually has no particular motive to intentionally breach the security wall created by the screening mechanism.").

**¶23** Second, and more importantly, a *Romley*-style screening could never be effective because Blum, the focus of MCAO's screen, is not merely

an MCAO employee but also a crime victim who possesses the full panoply of victims' constitutional rights. Any complete screening process would unlawfully impinge upon his rights because it would restrict his ability to exercise his constitutional rights as a victim, including appearing at proceedings or consulting on plea deals. Our constitution will not countenance such a restriction. Accordingly, though a complete screening like the one in *Romley* may ameliorate any potential harm to Durand, it would impermissibly vitiate Blum's constitutional rights.

## III.

¶24　　This Court's jurisprudence recognizes that certain prosecutorial conflicts may implicate a defendant's due process rights. *See e.g., Chambers*, 255 Ariz. at 468–70 ¶¶ 19–28; *Marner*, 251 Ariz. at 201 ¶ 15. And in *R.S. v. Thompson*, 251 Ariz. 111, 118 ¶ 20 (2021), we concluded that—when a defendant's due process right to a fair trial and a victim's state constitutional rights directly conflict—the due process right prevails. *See also Morehart v. Barton*, 226 Ariz. 510, 516 ¶ 23 (2011) (directing trial courts to enforce victims' rights unless the result would deprive the defendant of a fair trial); *State v. Riggs*, 189 Ariz. 327, 330 (1997) ("[I]f, in a given case, the victim's state constitutional rights conflict with a defendant's federal constitutional rights to due process . . . the victim's rights must yield."); *State v. Bible*, 175 Ariz. 549, 602 (1993) ("It cannot be doubted that victims of crime, and their families, have certain rights. It is equally clear, however, that these rights do not, and cannot, conflict with a defendant's right to a fair trial." (internal citations omitted)). In such circumstances, disqualification of a prosecutorial office will preserve *both* the defendant's due process rights and the exercise of the full panoply of victims' rights. Accordingly, on remand, the trial court should consider whether the circumstances in this case constitute a conflict that violates Durand's due process right to a fair trial.

¶25　　No bright-line rule for determining whether a conflict such as the one presented in this case constitutes a due process violation has been established; thus, courts must analyze each case according to its specific facts. As the Supreme Court has observed:

> [D]ue process "is not a technical conception with a fixed content unrelated to time, place and circumstances." Rather, the phrase expresses the requirement of "fundamental fairness," a requirement whose meaning can be as opaque as its importance is lofty. Applying the Due Process Clause is therefore an uncertain enterprise [that] must discover what "fundamental fairness" consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.

*Lassiter v. Dept. of Soc. Servs.*, 452 U.S. 18, 24–25 (1981) (citation omitted) (quoting *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961)).

**¶26**　　　　We believe the *Gomez* factors, as clarified in this Opinion, provide a suitable analytical framework for a trial court under these circumstances. As previously indicated, "neutrality in adjudicative proceedings" is vital because it "preserves both the appearance and reality of fairness." *Marshall*, 446 U.S. at 242. And if a defendant's due process rights to a neutral and fair trial directly conflict with a victim's state constitutional rights, the defendant's rights prevail. *R.S.*, 251 Ariz. at 118 ¶ 20. Accordingly, when applying the *Gomez* factors, the trial court must analyze the parties' relevant interests in determining whether the alleged conflict violates the defendant's right to a fundamentally fair trial. Specifically, the court must determine whether the defendant's right to a fair trial will "be damaged in some way if the motion [to disqualify] is not granted," and whether the appearance of impropriety "will outweigh any benefits that might accrue due to continued representation." *See Gomez*, 149 Ariz. at 226 (quoting *Alexander*, 141 Ariz. at 165).

**¶27**　　　　Here, the parties do not brief, and we do not attempt to address, every conceivable due process violation this circumstance presents. But the following are examples of issues a trial court should consider when applying the *Gomez* factors. For instance, if a victim has a higher level of prominence and authority in the prosecutor's office, permitting that office to prosecute the defendant could damage the defendant's due process right to a fair trial. The more intra-office influence

the victim has, the greater the risk the prosecution could be unduly affected. Even if the victim cannot directly influence the prosecuting attorney's handling of the case, there may be a risk of impropriety if the victim has internal influence over the prosecutor. These types of situations could implicate the *Gomez* factor concerning whether the defendant will be damaged if the motion is not granted. Additionally, the nature and circumstances surrounding the offense may be important and could affect the *Gomez* factor that weighs the possibility that public suspicion will outweigh any benefits that might accrue due to continued representation. For example, prosecuting a serious or violent crime on behalf of a fellow employee may motivate a prosecutor to aggressively pursue serious charges or sentences, whereas prosecuting a minor infraction is less likely to inspire similar truculence. Similarly, the court should consider whether the exercise of a victim-employee's rights (e.g., to be present at hearings) would likely cause public suspicion or the appearance of bias. A trial court should consider situations like these when determining whether a prosecutor's office may remain on a case without rendering the prosecution unfair or creating the appearance of impropriety.

¶28 These examples are clearly not exhaustive, but rather illustrative of the circumstances that a trial court should consider when deciding whether a conflict of interest contravenes a defendant's due process right to a fair trial. Because a motion to disqualify involves a fact-intensive inquiry, and will likely necessitate a hearing, we do not adopt a bright-line rule requiring the disqualification of a prosecutor's office when a victim is an employee of that agency. Rather, a trial court should consider all relevant evidence when making this decision.

## IV.

¶29 Finally, because the circumstance presented in this case is likely to recur, we delineate best practices for prosecutorial offices when they discover that an employee is also a crime victim.

¶30 Section 13-4434(A) prevents the release of a victim's personally identifying information. The trial court, nonetheless, "may order the victim's identifying and locating information to be disclosed . . . if

it is necessary to protect the defendant's constitutional rights." § 13-4434(D). However, before the court can disclose the victim's information, "the victim must be notified and has the right to be heard by the court." *Id.* Subsection (D) also states that once a court discloses a victim's identifying information, "the defendant's attorney may not disclose the information to any person other than the attorney's staff and a designated investigator," and that a victim's information cannot be disclosed to the defendant "without specific authorization from the court."

¶31 Therefore, upon learning that an employee is a crime victim, the state should file an *ex parte* motion under § 13-4434(D), notifying the trial court of the possible conflict. In compliance with subsection (D), the court should determine whether the victim's identifying and locating information must be disclosed. Though it is difficult to conceive of a situation where disclosing that a prosecuting office employs a victim is *not* necessary to protect a defendant's rights, we decline to fashion a bright-line rule requiring disclosure. Instead, we are confident the superior court will properly weigh all competing interests when deciding whether disclosure is necessary and, if so, how to make that disclosure. This procedure comports with relevant statutes and allows the trial court to protect the constitutional rights of both the victim and defendant.

## CONCLUSION

¶32 For the foregoing reasons, we reverse the trial court's order disqualifying MCAO, vacate the court of appeals' order, and remand to the trial court for further proceedings consistent with this Opinion.