IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

---

VERDELL CARMEN HAMLET,
*Petitioner,*

*v.*

STATE OF ARIZONA,
*Respondent.*

No. 2 CA-SA 2025-0062
Filed December 9, 2025

---

Special Action Proceeding
Gila County Cause No. CR202400412
The Honorable Michael D. Peterson, Judge

**JURISDICTION ACCEPTED; RELIEF GRANTED**

---

COUNSEL

Adams & Associates PLC, Phoenix
By Chase T. Wortham and Ashley D. Adams

and

Law Office of Randal B. McDonald, Phoenix
By Randal McDonald
*Counsel for Petitioner*

Bradley D. Beauchamp, Gila County Attorney
By Joseph E. Collins, Chief Deputy County Attorney, Globe
*Counsel for Respondent*

**OPINION**

Judge Eckerstrom authored the opinion of the Court, in which Presiding Judge Brearcliffe and Chief Judge Staring concurred.

E C K E R S T R O M, Judge:

¶1   In this special-action proceeding, petitioner Verdell Hamlet challenges the superior court's denial of his motion to vicariously disqualify the Gila County Attorney's Office (GCAO) from continued prosecution of his criminal case. He argues the GCAO must be disqualified based primarily on the appearance of impropriety—the fourth factor under *Gomez v. Superior Court*, 149 Ariz. 223 (1986). Because we agree that the court improperly applied the law of vicarious disqualification to the facts of this case, we accept special-action jurisdiction and grant relief.

**Factual and Procedural Background**

¶2   In September 2023, Hamlet and John Perlman—then a city magistrate in Globe, which is situated in Gila County—both kept horses in a stable where Hamlet also worked as a stable hand. As part of his duties, Hamlet sometimes fed hay to the stabled animals, including Perlman's horses. On September 26, Perlman confronted Hamlet with his suspicion that Hamlet had been stealing hay. A physical fight ensued, and Perlman's daughter intervened. Eventually, Hamlet retreated to his truck and called the sheriff's office. Hamlet, an 85-year-old man, allegedly suffered injuries to his skull and throat, the latter of which required a medical procedure. Perlman alleged that his arm had been fractured.

¶3   Perlman had previously installed video cameras to monitor his hay. At least one of those cameras captured the altercation. Although Perlman informed officers at the scene that he had been recording video footage of the barn's interior, they did not collect, and Perlman did not provide, any video evidence on the day of the incident. About a month after the incident, Perlman personally delivered the footage to the GCAO's office. The detective—an employee of the GCAO who testified to knowing Perlman professionally—accepted the evidence without questioning the delay in its submission or whether it had been edited or otherwise altered. The footage does not begin until midway through the altercation and shows only about fifteen seconds of the fight. It does not show the argument or events leading up to the physical fight and therefore does not provide

clarity as to which of the combatants was the aggressor. It also omits the events leading to Hamlet's throat injury, cutting out once both men had fallen to the ground outside the camera's field of vision.

¶4        Law enforcement body cam footage captured the investigating officer equivocating about who to charge. He specifically noted that he had "two conflicting stories," that the only other witness beyond the combatants was Perlman's daughter, and that he had collected no definitive evidence as to who had been the initial aggressor. For reasons that are unclear in the record, the officers ultimately cited Hamlet. Neither Perlman nor his daughter were cited. Body cam footage shows Perlman, before the citation was issued to Hamlet, telling a sheriff's deputy he was a local judge and then stating, with a chuckle: "Brad will want to do something with [the allegations] because it's me."

¶5        Bradley Beauchamp is the Gila County Attorney. As such, he "is responsible for everything that occurs in" the GCAO, according to a November 2024 letter the GCAO sent to Hamlet's counsel declining to disqualify itself from the matter. This includes exercising the authority to determine whether, and against whom, to bring criminal charges. Beauchamp explained at the disqualification hearing that the GCAO's head of the criminal division, Chief Deputy Collins, was overseeing Hamlet's case, while a third deputy county attorney based in Payson, was directly assigned to the case. Although the GCAO initially pursued only a misdemeanor assault charge against Hamlet, it later formally charged him with committing aggravated assault, a felony offense. After the lodging of the felony charges, the presiding judge of Gila County Superior Court concluded that the matter presented a conflict of interest for all judges in Gila County and reassigned the matter to a judge from another county.

¶6        In February 2025, Hamlet filed the underlying motion to disqualify the GCAO, arguing the personal relationship between Perlman and Beauchamp rendered the GCAO's continued representation "*per se* improper." In its March 2025 response, the GCAO stated that it had erected "numerous protections and solutions" to "shield[] Mr. Beauchamp from any participation as a prosecutor in this case." It represented that these precautions "ensur[ed] that Mr. Beauchamp has no contact with the victim." It further emphasized that Collins was the "sole and final decision maker on the means of the prosecution of this case" and that Collins had assigned the prosecution of the case to a GCAO attorney outside of the main office in Globe, the site of the incident. It maintained that these measures erased "even a scintilla of impropriety" from its continued representation.

The GCAO also represented that "Mr. Bea[u]champ has no access, influence or decision-making power in this particular matter."

¶7          At an evidentiary hearing, Beauchamp confirmed he was a friend of Perlman and conceded that he had been monitoring the case and had fielded public questions about it, had met with Perlman in Perlman's capacity as victim, and had been present for discussions about the appropriate plea to offer. The superior court nonetheless denied Hamlet's motion for disqualification. This petition for special action followed.

**Special-Action Jurisdiction**

¶8          Special-action jurisdiction is highly discretionary and is appropriate when, as here, a party has no "equally plain, speedy, and adequate" remedy by appeal. Ariz. R. Spec. Act. R. 2(b)(2); *see also White v. State*, 259 Ariz. 310, ¶ 4 (App. 2025). Although "[w]hether to accept jurisdiction of an appellate special action is within the court's discretion," Ariz. R. P. Spec. Act. 12(a), we have routinely handled questions of vicarious disqualification of a prosecutorial agency by special-action review, *see, e.g.*, *State v. Marner*, 251 Ariz. 198, ¶ 6 (2021); *Turbin v. Superior Court*, 165 Ariz. 195, 196 (App. 1990); *State ex rel. Romley v. Superior Court (Romley)*, 184 Ariz. 223, 225 (App. 1995). And, to the extent we conclude the GCAO's continued involvement in the prosecution risks an ongoing appearance of impropriety, such damage to the public perceptions of our justice system could not be fully remedied by a subsequent appeal, perhaps years after the start of prosecution. Finally, "disqualification of a prosecutor's office is a matter of statewide importance and is likely to recur." *State v. Chambers*, 255 Ariz. 464, ¶ 12 (2023). We therefore accept special-action jurisdiction.

**Discussion**

¶9          Hamlet argues that the longstanding friendship between Beauchamp and Perlman would undermine public confidence in any prosecution conducted by the GCAO. For this reason, Hamlet contends that the GCAO must be vicariously disqualified from further participation in his case on the ground that its continued role creates an appearance of impropriety. He further asserts that Beauchamp's continued involvement in the prosecution, the manner in which the GCAO has conducted that prosecution, and Perlman's crime-scene claim that Beauchamp would "want to do something . . . because it's me" all heighten the appearance of impropriety and would cause a reasonable observer to question the fairness of the criminal process in this case.

¶10 We review a superior court's decision whether to grant a motion to disqualify for abuse of discretion. *Chambers*, 255 Ariz. 464, ¶ 13. We defer to the court's factual findings and will affirm them if they are supported by reasonable evidence. *See Skaggs v. Fink*, 256 Ariz. 437, ¶ 5 (App. 2023); *State v. Dayton*, 257 Ariz. 58, ¶ 7 (App. 2024). But we review de novo conclusions of law. *Marner*, 251 Ariz. 198, ¶ 8. "An error of law in reaching a discretionary conclusion may constitute an abuse of discretion." *Chambers*, 255 Ariz. 464, ¶ 13 (quoting *State v. Thompson*, 252 Ariz. 279, ¶ 26 (2022)).

¶11 In ruling on a defendant's motion to vicariously disqualify, the superior court "must first determine whether the subject attorney must be disqualified from prosecution of the case." *Romley*, 184 Ariz. at 227-28. If a defendant meets the burden of showing disqualification of the subject attorney is necessary, the court must apply the four-factor *Gomez* test to determine whether vicarious disqualification of the entire office is also appropriate. *Chambers*, 255 Ariz. 464, ¶ 17. These factors are:

> (1) whether the motion is being made for the purposes of harassing the defendant, (2) whether the party bringing the motion will be damaged in some way if the motion is not granted, (3) whether there are any alternative solutions, or is the proposed solution the least damaging possible under the circumstances, and (4) whether the possibility of public suspicion will outweigh any benefits that might accrue due to continued representation.

*Gomez*, 149 Ariz. at 226 (quoting *Alexander v. Superior Court*, 141 Ariz. 157, 165 (1984)).

¶12 The fourth factor—whether the possibility of public suspicion outweighs the benefits that may accrue if the agency continues its representation—"is especially pertinent where the defendant is seeking to disqualify a prosecutor or an entire office." *Marner*, 251 Ariz. 198, ¶ 17. This is because "in a criminal prosecution, 'even the appearance of unfairness cannot be permitted.'" *Id.* (quoting *State v. Latigue*, 108 Ariz. 521, 523 (1972) (applying former version of rules of professional conduct)). Rather, "[j]ustice and the law must rest upon the complete confidence of the thinking public and to do so they must avoid even the appearance of impropriety." *Latigue*, 108 Ariz. at 523.

¶13    The superior court did not expressly find that Beauchamp himself has a conflict of interest preventing him from involvement in Hamlet's prosecution.  Instead, apparently assuming the presence of a conflict, the court applied the *Gomez* factors and determined, respectively as to those factors, that:  (1) Hamlet had made the motion in good faith; (2) Hamlet had failed to demonstrate he would be harmed by the GCAO's continued representation because "[t]he facts simply do not show that" Beauchamp and Perlman "are close personal friends, either currently or in the past," and that "Beauchamp is not involved in the prosecution of this case"; (3) Collins was "empowered as the final and sole decision-maker regarding the prosecution," with the implied conclusion that screening Beauchamp was unnecessary; and (4) Hamlet had not demonstrated public suspicion would outweigh the benefits of the GCAO's continued representation.  In short, the court found Hamlet had met only the first *Gomez* factor and thus vicarious disqualification was unnecessary.

¶14    Even deferring, as we must, to the superior court's factual determinations, *see Skaggs*, 256 Ariz. 437, ¶ 5, we cannot agree with the legal conclusions the court reached under the specific facts of this case.  *See Chambers*, 255 Ariz. 464, ¶¶ 17, 31 (implicitly treating conclusions as to *Gomez* factors as mixed question of law and fact and vacating trial court's grant of vicarious disqualification).  Specifically, the court erred by anchoring its inquiry of each *Gomez* factor in its determination that Beauchamp and Perlman were not "close personal friends" and that Perlman's retirement from the bench nullified any other potential for impropriety.  *Gomez* requires a court to apply the totality of the facts to each of the four factors, rather than considering only those facts going to the existence of an actual conflict.  *See State ex rel. Mitchell v. Palmer*, 257 Ariz. 187, ¶ 28 (2024) (superior court "should consider all relevant evidence" when deciding whether prosecutor's office must be disqualified).  Apart from its determinations regarding the depth of Beauchamp's friendship with Perlman, the court failed to address the other relevant evidence before it that suggested the GCAO's continued involvement might nonetheless reasonably appear improper to the public.  It failed to address whether Beauchamp had been properly screened from the case to the extent necessary to assuage any public perception that he was retaining influence over its prosecution.  Nor did it address whether any form of screening could cure that improper appearance given Beauchamp's public role as the head of the office.

¶15    In particular, the superior court erred in failing to apply the totality of the undisputed facts to the fourth *Gomez* factor.  This factor asks "whether the possibility of public suspicion will outweigh any benefits that

might accrue due to continued representation." *Gomez*, 149 Ariz. at 226; *see also Marner*, 251 Ariz. 198, ¶ 17.

**¶16**      We "will not ordinarily second-guess" a superior court's "determination regarding public perception of a fair trial in deciding whether to disqualify a prosecutor's office." *Marner*, 251 Ariz. 198, ¶¶ 12, 17. But, by basing its conclusions solely on the finding that Beauchamp and Perlman were not close personal friends, the court did not undertake the comprehensive inquiry required under *Gomez*. That inquiry requires consideration of whether Beauchamp's level of friendship with Perlman—however short of "close" [1]—coupled with all other undisputed events in the case, would create an appearance of impropriety.

**¶17**      The undisputed facts affecting public perceptions include: (1) Perlman invoked Beauchamp's name early in the investigation, conveying confidence that his relationship with Beauchamp would entitle him special treatment; [2] (2) the GCAO accepted important, material evidence directly from the judge-victim, more than a month after the incident, with no chain-of-custody tracking and no questions regarding its completeness, even though that evidence was in the form of video footage that could easily be altered, and which, if unaltered, should have captured the salient events; (3) Beauchamp admitted that, in flat contradiction of his office's written representations to the superior court before the hearing, he had participated in the prosecution by monitoring the case, by responding to community members' inquiries about the status of the case, and by attending a conversation between Collins and Perlman concerning a possible plea offer; and (4) Beauchamp acknowledged that he had remained

---

[1]Beauchamp testified that he and Perlman were "friends," that they shared office space and an administrative assistant for several years as young lawyers, and that they had taken their families on a fishing trip together. Beauchamp offered no testimony suggesting that whatever level of friendship they had established at that time had eroded in subsequent years. To the contrary, he acknowledged that they greeted each other cordially when they had casually encountered each other thereafter.

[2]At oral argument, Hamlet's appellate counsel acknowledged that a good defense attorney would elicit Perlman's comment—that "Brad will want to do something with it because it's me"—at trial. This would raise obvious questions to any juror, and any member of the public in attendance, whether the prosecution of Hamlet by the GCAO might have involved such favoritism.

apprised of the status of the prosecution, specifically "because of the community awareness of the case" and because of Perlman's stature in the community. At minimum, these facts demonstrate that the public was attentive to the case and that, once apprised of the above facts, it might have concluded that Hamlet was not being treated fairly based on Perlman's relationship to Beauchamp. Further, by fielding public inquiries about the case, Beauchamp necessarily signaled to the public that he retained some responsibility over the case. And, as the parties appeared to concede during oral argument, any trial of Hamlet would involve amplification and exploration of the above facts before the general public, including the jury.

¶18 Even if we were to assume that the superior court considered these factors but merely failed to articulate them in its order, the court nonetheless erred when it failed to make any finding regarding the second part of *Gomez*'s fourth factor: whether those facts giving rise to public suspicion would outweigh any benefits that might accrue due to the GCAO's continued representation. Given the ready ability of any other Arizona county to assume prosecutorial responsibilities of the case free from any appearance of impropriety, we are skeptical those benefits would outweigh the potential damage to public trust in the GCAO's neutrality.

¶19 During oral argument before this court, the GCAO struggled to articulate any special public need for its continued involvement beyond the minor efficiencies arising from its familiarity in working with the investigating agency.[3] On this record, we therefore conclude that the fourth *Gomez* factor weighs heavily in Hamlet's favor, and the superior court erred in finding otherwise.

¶20 Nor can we agree that the GCAO had sufficiently screened Beauchamp from participation in this matter, a necessary finding under the third *Gomez* factor. This factor asks whether any alternative solutions exist to vicarious disqualification or if full disqualification is the least damaging option. *Chambers*, 255 Ariz. 464, ¶ 29. Typically, vicarious disqualification

_____

[3]In weighing those competing interests, we are mindful that public perceptions of our justice system depend on our prosecuting agencies abiding by, and appearing to abide by, their own elevated standards of conduct. *See Villalpando v. Reagan*, 211 Ariz. 306, ¶ 11 (App. 2005) ("[A] prosecutor's duty to avoid a conflict of interest is prime because his paramount duty is to the principle of 'fairness.' In other words, his interest is not so much to prevail as to ensure that 'justice shall be done.'" (quoting *Pool v. Superior Court*, 139 Ariz. 98, 103 (1984))).

is unnecessary if a single attorney within a prosecuting agency has a conflict because that individual attorney may be screened. *See, e.g., Romley*, 184 Ariz. at 230. But, here, Beauchamp "has complete political and operational control" over the GCAO. As such, his influence extends to individual prosecutors assigned to the case even if Beauchamp does not make direct decisions on the case. *See, e.g., State v. Hursey*, 176 Ariz. 330, 334 (1993) (conflicted prosecutor "does not alleviate the 'appearance of impropriety' by merely assigning part of the case to another prosecutor" because "'public confidence in the criminal justice system . . . is eroded when a prosecutor has a conflict or personal interest in the criminal case which he is handling'" (quoting *Turbin v. Superior Court*, 165 Ariz. 195, 199 (App. 1990))).

**¶21** Further, the undisputed record indicates that the GCAO never actively screened Beauchamp from the case. *Contra Romley*, 184 Ariz. at 228-29 (noting features of effective screening process). Rather, the GCAO argued to the superior court that "Mr. Beauchamp may participate in this matter." And the evidence is undisputed that he did participate. As stated at length above, Beauchamp testified that he had personally interacted with Perlman about the case, more than once, citing his duty as a county prosecutor to speak to crime victims when they so requested. Beauchamp also testified that he had been present during a conversation between Collins and Perlman regarding the possibility of offering a plea agreement to Hamlet. And Beauchamp had directed his staff to keep him posted about the status of Hamlet's prosecution because of "community awareness" of the case, derived in part from Perlman's stature in the community. These facts all weigh in favor of finding that Beauchamp has not been meaningfully screened from the prosecution, notwithstanding the GCAO's avowal to the contrary.

**¶22** Even accepting the superior court's finding that Beauchamp and Perlman are not "close" personal friends, Beauchamp's level of involvement in the case, despite the GCAO's attestations that he had been fully screened from the matter, compounds the appearance of impropriety in this matter. "[A] successful screen must preserve both the reality *and* appearance of fairness." *Palmer*, 257 Ariz. 187, ¶ 21. Here, where Beauchamp concededly interacted with the public and victim regarding the case, the GCAO cannot persuasively maintain that Beauchamp did not present the public appearance of being involved. Thus, the third *Gomez* factor weighs heavily in Hamlet's favor.

**¶23** Finally, Hamlet presented substantial evidence, unaddressed by the superior court, supporting the second *Gomez* factor. This factor asks whether the party bringing the motion to disqualify is likely to suffer

prejudice if the motion is not granted. *Marner*, 251 Ariz. 198, ¶ 15. The superior court reasoned that Hamlet had failed to demonstrate he would be damaged by the GCAO's continued representation. But this determination was based solely on the court's observations that Beauchamp and Perlman were not "close personal friends," that Beauchamp was "not involved in the prosecution of this case," and that Perlman was no longer a magistrate judge. These findings fail to assess the potential for Hamlet to suffer prejudice in light of the court's implicit finding that some conflict existed and in light of the broader circumstances of the case.

**¶24** Defendants must offer more than mere speculation in arguing that they would be prejudiced in the absence of disqualification. *See Burch & Cracchiolo v. Myers*, 237 Ariz. 369, ¶ 30 (App. 2015) (reasoning that actual prejudice "is difficult to quantify" and courts should instead "consider whether prejudice *may* occur"). But Hamlet has offered plausible reasons to believe that the GCAO's continued involvement harms his legal prospects arising from the altercation. He has suggested in his pleadings below, and before this court, that his case has already been prosecuted far more aggressively than one would expect given the underlying facts. He expressly or implicitly directs us to: (1) the investigating deputy's initial uncertainty about who to believe and who to cite, (2) manifest irregularities in the collection and completeness of video evidence that could have clarified the identity of the more culpable party in the altercation, and (3) obvious prosecutorial challenges in presenting the alleged victim, Perlman, as a credible or sympathetic witness at any trial.[4]

**¶25** We are not equipped by either the incomplete pretrial record before us, or by our institutional role, to draw any ultimate conclusions about the strength of the state's case against Hamlet. But Hamlet does provide a non-trivial basis for contending he has already suffered actual prejudice: prejudice arising from the GCAO's discretionary decision first to prosecute him at all and then to elevate his charge from a misdemeanor to felony assault.

---

[4]Based on assertions by Hamlet's counsel to the superior court and to this court on appeal, Perlman would likely face cross-examination regarding the credibility of his version of events given Hamlet's advanced age, Perlman's remarks expecting favoritism, Perlman's delayed submission of the incomplete video evidence, and Perlman's apparently inaccurate testimony when describing details of the incident when seeking a protective order against Hamlet.

¶26 Fundamentally, "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate." Ariz. R. Sup. Ct. 42, ER 3.8, cmt. 1. Hamlet's strong personal interest as well as the more generalized public interest in maintaining confidence that the prosecutorial system operates fairly goes to the very integrity of the judicial system. *See Marner*, 251 Ariz. 198, ¶ 17. For these reasons, we conclude that each of the *Gomez* factors weighs in Hamlet's favor, and the superior court erred in its determination to the contrary.

¶27 In so concluding, we are mindful that in less populated counties such as Gila County, it would be impractical to require office-wide disqualification from every case in which the chief prosecutor has had some acquaintance with a victim or defendant. *See, e.g.*, *Chambers*, 255 Ariz. 464, ¶ 31 (vacating vicarious disqualification of the GCAO where Beauchamp previously represented criminal defendant in civil matters with "no substantial relationship" to prosecution). But our courts must assess each case of purported conflict under the totality of the circumstances under the *Gomez* factors. *Palmer*, 257 Ariz. 187, ¶ 25 ("[C]ourts must analyze each [Gomez] case according to its specific facts."). Here, we address more than a potential conflict based on mere acquaintance or a brief professional relationship. And, people residing in Arizona's less populated counties are no less entitled to have their public officials and institutions appear to conduct themselves in ways that inspire confidence under such circumstances. The GCAO must be vicariously disqualified from further representation in this matter.

## Disposition

¶28 For the foregoing reasons, we accept special-action jurisdiction and reverse the superior court's order denying vicarious disqualification of the GCAO. We remand the matter for further proceedings consistent with this opinion.