NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

JAMAL LAMAR JONES, *Appellant*.

No. 1 CA-CR 24-0616
1 CA-CR 24-0220
1 CA-CR 25-0170
(Consolidated)

FILED 03-30-2026

Appeal from the Superior Court in Maricopa County
No.  CR2019-154363-001, CR2010-142258-001, CR2018-125007-001
The Honorable Sam J. Myers, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph A. Newberg, II
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Jesse Finn Turner
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

---

Judge Jennifer M. Perkins delivered the decision of the Court, in which Presiding Judge Michael S. Catlett and Judge Angela K. Paton joined.

---

**P E R K I N S**, Judge:

¶1            Jamal Lamar Jones appeals his convictions and sentences for second-degree murder, abandonment or concealment of a dead body, and subsequent parole revocations. For the following reasons, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2            We view the facts in the light most favorable to upholding the jury's verdict. *State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013). In 2023, Jones was convicted of murdering his 18-year-old romantic partner, Letitia (a pseudonym), sometime in late August 2019. Her body was never found.

¶3            On September 20, police responded to a call of "unknown trouble" at Letitia's apartment, where they found evidence of a violent struggle that someone attempted to clean up. DNA analysis identified blood belonging to both Letitia and Jones in multiple places in the apartment, and Jones' fingerprints were found on a box of rubber gloves. A human remains detection dog alerted in the bedroom.

¶4            Three days later, police discovered Letitia's car had been towed from an apartment complex several miles away. Police found an open bottle of bleach, an unopened bottle of chlorine, a scrub brush, seven air fresheners, and a scuffed and dirty shovel in the car. The human remains detection dog alerted on the trunk, where police found Letitia's blood and a "yellowish-brown" fluid in the spare tire's wheel well.

¶5            Phone records showed Letitia's phone contacted Jones' first phone around 4:40 A.M. the morning of August 21. Cell tower data from Jones' second phone indicated he was near Letitia's apartment from 5:21 A.M. to 11:43 A.M. that day. Jones contacted Letitia back at 6:29 A.M., and her phone disconnected from the network ten minutes later. Jones' first phone also disconnected from the network around this time. Jones went to the hospital that night for a hand injury. He returned to Letitia's apartment every day from August 22 to August 27.

¶6          Letitia, who had a history of paying her rent early, did not pay her September rent. On September 9, Jones called Letitia's leasing office from his second phone using a blocked number, claiming to be her uncle, and asked if she had been evicted yet.

¶7          Surveillance footage showed that, on September 16, Jones drove Letitia's car to Wal-Mart and used cash to buy liquid chlorine, a shovel, a scrub brush, a rag, and a candle. On September 20, roughly four hours after a large police presence responded to Letitia's apartment, Jones' second phone disconnected from the network.

¶8          Police eventually located and arrested Jones in November 2019. The State charged him with second-degree murder, abandonment and concealment of a dead body, and misconduct involving weapons.

¶9          In October 2023, Jones was tried and convicted on the charges for second-degree murder and abandonment or concealment of a dead body. The jury found multiple aggravators for each count. After trial, Jones pled guilty to the misconduct involving weapons charge, and his parole was revoked in previous felony convictions from 2011 and 2018.

¶10          Jones received a maximum sentence of 25 years for second-degree murder, ten years for misconduct involving weapons, and six years for abandonment or concealment of a dead body, each to run consecutively to each other and to the prison terms in his 2011 and 2018 convictions. Jones appeals his 2023 convictions and resulting parole revocations. We have jurisdiction. Ariz. Const. art. 6, § 9; A.R.S. §§ 12-120.21(A)(1), 13-4031, -4033(A)(1).

**DISCUSSION**

¶11          Jones argues he was denied a fair trial because the State committed cumulative prosecutorial error. He did not object to these errors at trial, so to establish cumulative error, Jones "must: 1) assert cumulative error exists; 2) cite to the record where the alleged instances of misconduct occurred; 3) cite to legal authority establishing that the alleged instances constitute prosecutorial misconduct; and 4) set forth the reasons why the cumulative misconduct denied [him] a fair trial with citation to applicable legal authority." *State v. Vargas*, 249 Ariz. 186, 190, ¶ 14 (2020).

¶12          Jones claims four instances of prosecutorial error: (1) eliciting irrelevant and unfairly prejudicial testimony from Letitia's family members; (2) improperly appealing to the jury's sympathies and passions; (3) improperly eliciting an unqualified expert opinion from a lay witness;

and (4) impermissibly commenting on Jones' in-courtroom silence. We review each instance individually for error, and will reverse only if "the cumulative effect of any errors we find so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Robinson*, 253 Ariz. 121, 143, ¶ 64 (2022) (cleaned up). Jones need not demonstrate prejudice for each instance because "a successful [cumulative error] claim necessarily establishes the unfairness of a trial." *Vargas*, 249 Ariz. at 190, ¶ 13; *State v. Escalante*, 245 Ariz. 135, 142, ¶ 21 (2018).

## I.    Relevance of the testimony of Letitia's aunt and grandmother.

¶13        Jones takes issue with the testimony of Leticia's aunt ("Aunt") and grandmother ("Grandmother") relating to Letitia's mother's ("Mother") upbringing, Letitia's early life and living arrangements, and Mother's relationships with Aunt and Grandmother. He argues this evidence was irrelevant to Letitia's disappearance at age 18 and unfairly prejudicial. He alleges the State intentionally introduced this irrelevant evidence to play on the jurors' sympathies and invite them to consider improper evidence in rendering their verdict. The State counters this evidence was relevant to whether Letitia was murdered because her "pattern of life" showed she did not disappear by choice.

¶14        Aunt and Grandmother both testified to the family's complicated dynamics throughout Letitia's life, their close relationships with Letitia, and Letitia's strained relationship with Mother. Both witnesses described Mother, who had Letitia as a teenager, as a destabilizing force in Letitia's life. Mother frequently moved apartments without warning, brought strange men into her home, and mistreated Letitia and her siblings. Both women described Letitia as someone who wanted stability.

¶15        Given this instability, both women took on maternal roles in Letitia's life. Letitia lived with Aunt as a toddler. Throughout her childhood, Letitia frequently fought with Mother and periodically lived with Grandmother. The State questioned the witnesses about Letitia's jobs, her new apartment, and her vehicles, which Aunt characterized as Letitia's steps towards independence from Mother.

¶16        The State concluded its questioning of Aunt by asking her if she believed Letitia ran away "given [her] experience in [Letitia's] life." Aunt said no, she did not believe Letitia had the life experience to uproot herself and start over on her own. She believed Letitia was dead because she would not disappear for so long without speaking to her family. Grandmother also testified that she did not believe Letitia would run away.

**¶17** This evidence was relevant. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Ariz. R. Evid. 401. Relevant evidence is generally admissible; irrelevant evidence is inadmissible. Ariz. R. Evid. 402. Relevant evidence may be excluded when "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Ariz. R. Evid. 403. Evidence is unfairly prejudicial if it has "an undue tendency to suggest a decision on an improper basis, such as emotion, sympathy, or horror." *State v. Schurz*, 176 Ariz. 46, 52 (1993) (cleaned up).

**¶18** Aunt's and Grandmother's testimony was relevant to whether Letitia disappeared by choice and whether she was still alive, possibilities the State had to exclude to prove the charges beyond reasonable doubt. The nuanced family dynamics painted a picture of a young adult who was eager to establish her independence and sought a stable home life denied to her in childhood. Her living arrangements served as an example of that instability and explained the depth of her ties to Aunt and Grandmother. Collectively, this evidence supported Aunt's and Grandmother's opinions that Letitia did not run away and was dead.

**¶19** "[N]ot all harmful evidence is unfairly prejudicial. After all, evidence which is relevant and material will generally be adverse to the opponent." *Id.* And "courts may mitigate the prejudicial impact of evidence with proper jury instructions." *State v. Strong*, 258 Ariz. 184, 212, ¶ 123 (2024). Given its relevance to an essential element of the State's case, and the court's instruction to the jury "not [to] be influenced by sympathy or prejudice," Jones has not established that unfair prejudice substantially outweighed the probative value of Aunt's and Grandmother's testimony.

## II. Improper appeals to the jurors' passions and sympathies.

**¶20** Prosecutors may not make arguments that "appeal to the fears or passions of the jury" by playing on their "sympathy for the victims and fears of the defendant." *State v. Morris*, 215 Ariz. 324, 337, ¶ 58 (2007). A prosecutor's statements improperly appeal to the jurors' passions if they "(1) call to the attention of the jurors matters that they would not be justified in considering in determining their verdict, and (2) there is a high probability that the jurors, under the circumstances of the particular case, were influenced by the remarks." *State v. Hulsey*, 243 Ariz. 367, 391, ¶ 109 (2018) (cleaned up).

### A. References to Aunt's and Grandmother's testimony.

**¶21**		Jones argues the State improperly appealed to the jury's sympathies when it referenced Aunt's and Grandmother's testimony continuously throughout its opening statement and closing argument. This argument assumes the State improperly elicited that testimony, and thus drew the jury's attention to matters it should not consider. As explained above, this testimony was properly admitted. Prosecutors have wide latitude to comment on and argue any reasonable inferences to be drawn from the evidence. *State v. Hughes*, 193 Ariz. 72, 85, ¶ 59 (1998). The prosecutor did not err because he did not draw the jury's attention to matters it should not consider.

### B. The prosecutor's "empty chairs" statement.

**¶22**		During closing argument, the prosecutor made the following statement: "Had [Letitia] not been born into that situation, she could be sitting in one of the empty chairs next to you in some other trial, her death never becoming reality, but unfortunately she was unable to escape."

**¶23**		Jones contends this comment alone is reversible error, so we review separately for fundamental, prejudicial error. *See Escalante*, 245 Ariz. at 142, ¶ 21. Even assuming it was error for the prosecutor to invite the jurors to imagine the victim as one of their peers, as Jones contends, there was not a high probability that the jurors were influenced by the remarks under the circumstances here.

**¶24**		An improper appeal to the jury's emotions is not fundamental error if the comment is "fleeting" and cured by appropriate instructions, as was the case here. *State v. Escalante-Orozco*, 241 Ariz. 254, 282, ¶¶ 101–103 (2017), *abrogated on other grounds by State v. Escalante*, 245 Ariz. 135 (2018). This isolated comment occurred in the context of the State's lengthy closing argument, which spanned an hour and a half. And the court instructed the jury "not [to] be influenced by sympathy or prejudice," which we presume the jury followed. *See Strong*, 258 Ariz. at 212, ¶ 124; *State v. Ottman*, 144 Ariz. 560, 562–63 (1985) (a prosecutor's improper comment that the victim's life was "totally destroyed" was cured by appropriate instructions). Even assuming this comment was error, Jones has not shown it amounted to prejudicial, fundamental error.

### III.	Detective Treusink's expert testimony.

**¶25**		Jones next argues the State elicited improper expert testimony from Detective Treusink, the lead investigator. The detective had

investigated deaths and homicides in the Phoenix area for over 15 years and been the lead case agent on over two dozen homicide investigations. The State asked him to identify the yellow-brown substance from the wheel well. He said he "[did]n't know, exactly, what it [was]" but that he had observed, over his "hundreds if not well over a thousand investigations," that body fat will melt and separate into a semi-soft liquid as it decomposes, similar to the liquid in the wheel well. It would be more liquid than solid in a Phoenix summer. When asked if he knew what the substance was called, he said its scientific name was "adipocere." Jones contends this was an impermissible expert opinion from a lay witness because the detective did not have a medical degree and was not a pathology expert. He argues the prosecutor erred by presenting this improper testimony with, at minimum, indifference to the prejudice it caused Jones.

¶26　　　　An expert witness is someone qualified "by knowledge, skill, experience, training, or education," whose knowledge assists the jury in understanding the evidence, who testifies based on sufficient facts, and applies reliable "principles and methods to the facts of the case." Ariz. R. Evid. 702. An expert's skill and knowledge need only be "superior to that of people in general" and be helpful to the jury on a particular subject. *State v. Thompson*, 252 Ariz. 279, 296, ¶ 64 (2022). For example, in *Thompson*, a veteran detective with experience investigating murders and assaults could testify whether wounds on a victim were defensive wounds because his knowledge of defensive wounds was superior to the general public's, and his insight would assist the jury. *Id.*

¶27　　　　Likewise, Detective Treusink's experience as a veteran homicide detective gave him superior knowledge of human decomposition that could help the jury identify the fluid in the wheel well. The detective qualified as an expert because he had investigated "hundreds" of deaths and had seen this fluid before. Indeed, he did not conclusively state the substance was melted body fat, and admitted on cross-examination that he did not know for certain what it was, only that "he had seen that particular fluid in other places" when investigating other deaths. And as a Phoenix detective, that experience extended to the appearance of that fluid in extreme heat. His lack of a medical degree or training in pathology went to the weight of his testimony, not its admissibility. *State v. Davolt*, 207 Ariz. 191, 210, ¶ 70 (2004). The prosecutor did not err in eliciting this part of the detective's testimony because his experience qualified him as an expert to compare the substance in the wheel well to melted body fat.

¶28　　　　At most, any error arising out of Detective Treusink's testimony comes from the lack of foundation explaining how the detective

knew the scientific name for decomposing body fat, "adipocere." The detective's experience investigating homicides does not explain how he knew this term. We assume, without deciding, that the prosecutor erred by eliciting this part of the detective's testimony without first laying the proper foundation. But even so, Jones has failed to show how the introduction of the term "adipocere" prejudiced him, given we hold the State properly elicited testimony that the substance looked like decomposing fat. Whether the jury heard testimony comparing the substance to "adipocere" or "decomposing body fat" was inconsequential.

### IV.      The State's comments on Jones' silence.

¶29      In closing argument, the prosecutor highlighted Jones' actions in the months leading up to his arrest. Jones was in Letitia's apartment on the day of her suspected death. He did not report her missing to family members. He turned off his phone the same day police first investigated her apartment. Letitia's family members named him as a person of interest. Police located all of Jones' associates, yet because his phones were off, could not find Jones himself. The prosecutor then said, "Again, why would this happen if he didn't kill her? Why isn't he there at the scene saying, we had a spat, but I would never hurt her? No. He's disappeared himself."

¶30      Jones argues this comment violated his right against self-incrimination because it implicitly referenced his decision not to testify. Fifth Amendment protections do not apply to a defendant's pre-arrest, pre-*Miranda* silence when there is no state action inducing the silence. U.S. Const. amend. V; Ariz. Const. art. 2, § 10; *State v. Lopez*, 230 Ariz. 15, 20, ¶ 16 (App. 2012). The prosecutor's comments referred to Jones' actions from August 21 to his arrest in November, and Jones does not argue this silence was induced by the State. The prosecutor permissibly commented on Jones' pre-arrest silence, not his in-courtroom silence.

### V.      Cumulative prosecutorial error.

¶31      At most, Jones has asserted two instances of prosecutorial error: the prosecutor's "empty chairs" comment, and the elicitation of unfounded testimony that the scientific name for decomposing body fat is "adipocere." The prosecutor's comment was a fleeting comment amidst a lengthy closing argument and cured by appropriate jury instructions. And Jones has not shown how the use of the term "adipocere" was unfair to him. The cumulative effect of these isolated errors did not otherwise infect Jones' trial with unfairness. There was no cumulative error here.

## CONCLUSION

¶32      We affirm Jones' convictions and sentences.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:      JR